THE STATE OF OHIO, APPELLEE, *v.* WILLIAMS, APPELLANT.

[Cite as *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396.]

(No. 1999–1218—Submitted March 11, 2003—Decided September 3, 2003.)

LUNDBERG STRATTON, J.

{¶ 1} Appellant, Shawn C. Williams, was convicted of the rape and aggravated murder of his girlfriend, Catrise Gregory, and of a rape-murder capital specification. After a penalty hearing, the trial court sentenced Williams to death. He appeals from his convictions and death sentence. Although we affirm his convictions, we find that the penalty phase of Williams's trial was affected by reversible error. We therefore reverse the death sentence imposed in this case and remand the cause to the Lucas County Court of Common Pleas for resentencing.

{¶ 2} In 1995, 17-year-old Catrise Gregory was a student at Bowsher High School in Toledo; she also worked afternoons and weekends at a Taco Bell restaurant. About a year before she was murdered, Catrise began dating appellant, 21–year–old Shawn Williams. By the fall of 1995, Williams was seeing Catrise almost daily.

{¶ 3} Catrise permitted Williams to keep her car most of the time. He routinely drove Catrise to and from school and work, meanwhile keeping her car all day. Frequently, after driving Catrise home, Williams kept her car overnight.

{¶ 4} In October 1995, Catrise told her mother that she was pregnant by Williams. She also told some of her friends. Catrise told her friend Sabrina Harris that she and Williams had been trying to conceive a child. According to Harris, Williams knew about Catrise's pregnancy.

{¶ 5} In November 1995, the relationship between Catrise and Williams began to deteriorate, and on Thanksgiving Day (November 23), 1995, Catrise told a friend that she "was going to break up with [Williams]." Near the same time, she also told her mother that she wanted to end her relationship with Williams.

{¶ 6} Friday, December 8, 1995, was the last day Catrise was seen alive. That afternoon, she worked from 4:00 until after 9:00 p.m. at Taco Bell, and then she got permission to leave early because she was not feeling well. However, she could not leave right away because Williams had her car. Between 9:30 and 9:45

p.m., Williams finally came to pick up Catrise. Before she left, Catrise told her coworker Antoine Lewis that she intended to break up with Williams.

{¶ 7} Catrise never made it home on the night of December 8, nor did she report for work as scheduled the next morning.

{¶ 8} At approximately 8:00 or 9:00 a.m., December 9, a Toledo resident noticed Catrise's car parked on the street in front of his house. The following night, Toledo police officers approached the car in response to a 911 call. They found Catrise's body in the driver's seat, slumped over the steering wheel.

{¶ 9} Dr. Diane Scala–Barnett, a deputy coroner and forensic pathologist for the Lucas County Coroner's Office, conducted the autopsy and concluded that Catrise had been strangled. Scala–Barnett found bruises on Catrise's nose and ear and "fairly extensive bruising" underneath her upper lip. There were also abrasions on her chin and neck and a laceration on her neck. Scala–Barnett concluded that Catrise's injuries were inflicted between one and six hours before her death. According to Catrise's coworker Antoine Lewis, Catrise had no visible injuries when he saw her last.

{¶ 10} Scala–Barnett found a bruise on Catrise's labia minora that had also been inflicted between one and six hours before her death. According to Scala–Barnett, such an injury is generally caused by a forceful attempt to penetrate the victim's vagina and "normal sexual activity" would not cause such an injury. After finding that bruise, Scala–Barnett took cervical and vaginal swabs because the injuries indicated a possible sexual assault.

{¶ 11}. Catrise's mother, Antoine Lewis, and Sabrina Harris all attended Catrise's funeral, but none of them saw Williams there. Catrise's friend LaAmora Dawson saw Williams at the funeral but not at the cemetery afterward.

{¶ 12} On December 14, Toledo Police Detective James Scott located Williams and asked him to come to the police station with him so that a detective could talk to him about Catrise. Williams agreed. When he got into Scott's car, Williams began to cry.

{¶ 13} At the station, Detective Harold Mosley interviewed Williams. (Scott was also present during most of the interview.) Mosley began by asking Williams whether he knew why Mosley wanted to talk to him. Williams said that he did and said that he was "surprised that [Mosley] hadn't talked to him before." Williams appeared anxious and emotional.

{¶ 14} Williams told the detectives that he had last seen Catrise on Friday, December 8. He said that he had picked Catrise up at the Taco Bell that night between 9:30 and 9:45 p.m. and that she was angry with him because he was late. According to Williams, they went to his mother's house but left because nobody was home. They then went to Williams's grandmother's house and sat outside

for about half an hour, talking. When Catrise told Williams that she had to work the next day, Williams went inside the house, and Catrise drove away.

{¶ 15} Williams told the officers that 10 or 15 minutes after Catrise left, he walked to his cousin's house. After another 10 or 15 minutes, he left his cousin's house with a female acquaintance who gave him a ride to Cherry Street, and he walked to the nearby house of another female acquaintance. After a brief visit, he took a taxi to his brother's house, where he spent the night.

{¶ 16} Mosley asked Williams whether he had had sex with Catrise at his mother's house. Williams said that he had not and claimed that the last time he had had sex with Catrise was on Tuesday, December 5. Mosley asked Williams whether he had killed Catrise. Williams was visibly upset by the question, but he denied killing Catrise.

{¶ 17} Semen extracted from the underwear on Catrise's body was subjected to DNA testing and was compared with known DNA samples from Williams. Angela Lineen, supervisor of the DNA laboratory at the Medical College of Ohio ("MCO"), determined that the semen from the underwear contained DNA that was consistent with the DNA sample from Williams.

{¶ 18} According to Dr. Ming You, also of MCO, Williams's DNA pattern would occur in 1 in 250,000 African–Americans, 1 in 12.4 million Hispanics, and 1 in 33.4 million Caucasians. Moreover, all genetic markers found in the underwear could be attributed to either Catrise or her assailant; there was no evidence that a third party had contributed DNA.

{¶ 19} Brian Wraxall of the Serological Research Institute, a private consulting laboratory, examined DNA from sperm cells found on the cervical swab taken during the autopsy. The DNA was consistent with Williams's DNA, but a conclusive match could not be made; one-fourth of the general male population could not be excluded as the source.

{¶ 20} Wraxall also noted that the large quantity of sperm on the swab and the large number of sperm having intact tails indicated that sexual intercourse had taken place within 24 hours before Catrise's death, on a conservative estimate. He explained that bodily functions cause sperm to break down quickly inside the body, but those functions stop when a person dies. Thus, the more sperm and the more sperm with intact tails found after death, the briefer the interval between intercourse and death. According to Wraxall, since Catrise was alive at 9:30 p.m. on Friday, December 8, 1995, the time she left Taco Bell, the sperm could not have been deposited on Tuesday, December 5, which is when Williams claimed to have last had sex with Catrise.

{¶ 21} Jeffrey Williams, a forensic scientist in the serology DNA analysis unit of the Ohio Bureau of Criminal Identification and Investigation, examined a slide

made using the vaginal swab taken during the autopsy of Catrise's body. Like Wraxall, he also found large numbers of sperm with intact tails and concluded that intercourse likely took place no more than 24 hours before death.

{¶ 22} A two-count indictment was returned against Williams. Count One charged him with aggravated murder while committing rape. R.C. 2903.01(B). Specification One, a death-penalty specification, alleged that Williams committed the aggravated murder while committing rape and that he was the principal offender in the aggravated murder. R.C. 2929.04(A)(7). Count Two charged Williams with rape. R.C. 2907.02(A)(2).

{¶ 23} The jury found Williams guilty of both counts and of the specification. When the jury returned its guilt-phase verdict, Williams assaulted one of his attorneys. Shortly thereafter, the court adjourned for the weekend. Defense counsel did not visit Williams in jail over the weekend between the guilt and penalty phases, a step they said they would have taken but for the assault.

{¶ 24} When court reconvened the next Monday, both defense attorneys moved to withdraw from the case. The judge asked each attorney whether he could fulfill his obligation to represent Williams zealously. The attorney who had been assaulted said that he could not. He admitted that he was afraid of Williams and that he felt that the assault had "poisoned the relationship." His co-counsel could not definitively answer the question.

{¶ 25} Despite these answers, the trial court was not persuaded that the assault had rendered the attorneys unable to zealously represent Williams. The court therefore denied leave to withdraw. The penalty phase proceeded, and the jury recommended a death sentence for the aggravated murder. The trial judge sentenced Williams to death. Williams appeals to this court as of right.

## I. Jury Issues

### A. Juror's Repudiation of Verdict

{¶ 26} On Friday, March 19, 1999, the jury returned its guilt-phase verdict of guilty on both counts and on the death specification. The jury was polled; each juror was asked whether this was his or her vote, and each answered, "Yes." The signed verdict forms were filed that day.

{¶ 27} On Monday, March 22, before the penalty phase began, the jurors were individually asked by the court whether they could set aside Williams's assault on his attorney the previous Friday. After being questioned, juror Middlebrooks asked to speak to the judge.

{¶ 28} Middlebrooks said that she was not convinced beyond a reasonable doubt that Williams was guilty of rape. She acknowledged that the guilt-phase verdict was hers, and when asked, "Are they still your verdicts?" she said, "Yes."

But she said that her vote on the rape charge did not reflect her opinion; she said that she had signed the form because of pressure from other jurors.

{¶ 29} The next day, an order was entered in the trial court's journal stating that the defendant had been found guilty of Counts 1 and 2 and the specification.

{¶ 30} In his first proposition of law, Williams contends that a juror may repudiate her vote at any time until the jury's verdict has been entered on the trial court's journal. Since the jury's guilt-phase verdict had not been journalized at the time that Middlebrooks sought to retract her vote, Williams contends that his motion for a new trial should have been granted.

{¶ 31} In support of this argument, Williams quotes *Mapes v. Coyle* (C.A.6, 1999), 171 F.3d 408, a federal decision interpreting Ohio law as follows: "A juror may change her mind at any time *before the verdict is entered * * *.*" (Emphasis added.) Id. at 424. However, other language in *Mapes* makes clear that "entered" means affirmed when polled: "[A] juror may change his mind *between the jury room and the court room.*" Id. at 422.

{¶ 32} Moreover, *Mapes* is distinguishable from this case. In *Mapes,* a juror gave an ambiguous response *when the jury was polled*; *Mapes* held that the trial court should have inquired to determine whether the juror had changed her mind. *Mapes* did not involve the issue raised in this case: whether a juror may change her mind *after* being polled and affirming that the verdict is her own, but *before* the verdict has been journalized.

{¶ 33} Similarly, in *State v. Brown* (1953), 110 Ohio App. 57, 12 O.O.2d 227, 168 N.E.2d 419—the Ohio case on which *Mapes* principally relied—a juror equivocated when the jury was polled. The court of appeals held that the juror had a right to change her vote, and that the trial court should have directed the jury to deliberate further. The court observed: "A juror may, after coming into court, change his vote, and so express himself to the court *when the poll is taken.*" (Emphasis added.) Id. at 61, 12 O.O.2d 227, 168 N.E.2d 419. Thus, neither *Mapes* nor *Brown* supports the broad proposition that a juror may repudiate her vote at any time *before journalization of the verdict.*

{¶ 34} Numerous cases hold that the verdict becomes final once the jury has been polled and each juror has assented to the verdict in open court. "A verdict is final if (1) the deliberations are over, (2) the result is announced in open court, and (3) the jury is polled and no dissent is registered." *United States v. White* (C.A.5, 1992), 972 F.2d 590, 595. See, also, *United States v. Dakins* (C.A.D.C. 1989), 872 F.2d 1061, 1065; *United States v. Williams* (C.A.9, 1993), 990 F.2d 507, 513; *Boykins v. United States* (D.C.1997), 702 A.2d 1242, 1247, 1249; *Tinch v. State* (1997), 113 Nev. 1170, 946 P.2d 1061, 1064; *Ross v. State* (1975), 24 Md.App. 246, 249–256, 330 A.2d 507, reversed on other grounds (1976), 276 Md. 664, 350 A.2d 680. Compare *State v. Knight* (1988), 143 Wis.2d 408, 421 N.W.2d 847

(verdict not final until accepted by trial court and verdict is deemed accepted when received and announced in open court).

{¶ 35} In *United States v. Dakins,* supra, the court specifically rejected a claim similar to that urged by Williams—that a juror could repudiate her vote at any time until the verdict was file-stamped and docketed: "The time at which the courtroom clerk attended to the strictly clerical task of file-stamping the verdict form and docketing the verdict is immaterial. * * * A verdict becomes immutable by the jury once announced in open court, or when it has been confirmed by a poll, if ordered." 872 F.2d at 1065. Accord *Boykins v. United States,* supra.

{¶ 36} We agree with these cases. In our view, the jury poll is well suited to serve as the benchmark of finality. The poll is a solemn ceremony whose formality signals the conclusive nature of the verdict to all who are present. *Ross v. State,* supra, 24 Md.App. at 255, 330 A.2d 507. The poll focuses each juror's attention on the verdict and gives each a clear-cut opportunity "to declare in open court her assent to or dissent from the [verdict]." *State v. Hessler* (2000), 90 Ohio St.3d 108, 121, 734 N.E.2d 1237.

{¶ 37} The function of the poll is "to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." *Miranda v. United States* (C.A.1, 1958), 255 F.2d 9, 17; see, also, *Hessler.* Once that function has been accomplished, there is no compelling reason to let individual jurors change their minds.

{¶ 38} Thus, we hold that once a poll of the jurors has been completed and all have assented to the verdict, a juror may not thereafter rescind or modify his or her vote. Accordingly, Williams's first proposition is overruled.

## B. Jury Selection

{¶ 39} In his fourth proposition of law, Williams contends that two prospective jurors were improperly dismissed for cause. He argues that under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and R.C. 2945.25(C), it is improper to excuse a prospective juror for cause in the death-qualification process unless the juror unequivocally states that he would not recommend death under any circumstances.

{¶ 40} However, the constitutional standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841; *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. We have held that if a juror satisfies the *Witt* criterion, he may be

excluded for cause under the catchall provision of R.C. 2945.25(O) even when he does not satisfy the more specific R.C. 2945.25(C). *State v. Buell* (1986), 22 Ohio St.3d 124, 139, 22 OBR 203, 489 N.E.2d 795; *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274. Williams invites us to overrule these holdings, but we decline. See, e.g., *State v. Frazier* (1995), 73 Ohio St.3d 323, 329, 652 N.E.2d 1000. Williams's fourth proposition of law is therefore overruled.

{¶ 41} Prospective juror Nissen was excluded for cause based on his views regarding capital punishment. In his fifth proposition of law, Williams contends that it was improper to exclude Nissen even under the *Witt* standard.

{¶ 42} Nissen was opposed to the death penalty due to his religious beliefs. The judge asked him whether he could "follow the instructions and apply the instructions of law and fairly consider imposing the death penalty if appropriate in a case." Nissen said, "[I]f beyond a reasonable doubt I still think I would stay with my belief." The judge then asked, "[I]f the aggravating factors overcame the mitigating factors and the Court instructs you that you must impose the death penalty, are you saying that you could not apply the law in that case and vote to impose the death penalty?" "Right," Nissen said.

{¶ 43} However, under questioning by defense counsel, Nissen seemed to contradict himself. He stated that he could follow the trial court's instructions even if the evidence supported a decision to recommend death.

{¶ 44} The trial judge then asked, "Does that mean in spite of your religious views if based upon the evidence and the instructions of law beyond a reasonable doubt the Court has instructed you under certain circumstances if you find aggravating factors outweighing mitigating factors you must impose the death penalty, would you do that?" Nissen replied, *"No, I don't think I could."* (Emphasis added.) The trial court granted the state's challenge for cause.

{¶ 45} A trial court's resolution of a challenge for cause will be upheld on appeal unless it is unsupported by substantial testimony. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915. Nissen's answers supported the trial court's decision. The trial court informed Nissen that the jury must impose the death penalty if it found that the aggravating factors outweighed the mitigating circumstances and asked him whether he would follow such an instruction. Nissen said that he did not think that he could. Thus, the court could find that his ability to perform his duty in accordance with the court's instructions was substantially impaired.

{¶ 46} Williams contends that once his counsel elicited Nissen's statement that "I can follow his instructions," the inquiry should have immediately ended. Therefore, he asks us to disregard all that Nissen said after that point. But the trial judge has discretion over the scope, length, and manner of voir dire. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 40; *State v.*

*Getsy* (1998), 84 Ohio St.3d 180, 190, 702 N.E.2d 866. Where, as here, the juror appears to contradict an earlier statement that he could not vote to impose the death penalty, a judge does not exceed his discretion by trying to resolve the contradiction. The judge did not have to take the statement elicited by defense counsel as the juror's last word on the subject. See *Frazier*, supra, 73 Ohio St.3d at 328, 652 N.E.2d 1000. Williams's fifth proposition of law is overruled.

{¶ 47} In his sixth proposition of law, Williams contends that prospective juror Smith should have been excused for cause. Smith stated on voir dire that because of the training police officers receive, he "probably would" believe a police officer's testimony as to what he had observed more than he would believe similar testimony by a layperson. When asked if he could set that opinion aside, Smith said, "I would like to believe I could set it aside, but honestly I can't say yes or no to that question."

{¶ 48} However, when questioned further, Smith stated that he would not automatically give the testimony of police officers greater credence or weight than other witnesses but would weigh such testimony in the same way that he would weigh other testimony. Thus, substantial testimony supports the denial of the defense challenge for cause. *Wilson*, supra. Williams's sixth proposition of law is overruled.

## II. Weight and Sufficiency of Evidence

{¶ 49} In his 12th proposition of law, Williams contends that the verdict was against the manifest weight of the evidence. See, generally, R.C. 2953.02; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541; *State v. Smith* (1997), 80 Ohio St.3d 89, 102–103, 684 N.E.2d 668.

{¶ 50} We begin our analysis by considering whether the evidence of guilt was sufficient to support the jury's verdict. On sufficiency-of-the-evidence review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 51} We find that the evidence is sufficient to establish Williams's guilt of the crime of which he was convicted. Williams points out that there were no witnesses to the crimes and that he did not confess. And although the exact time of Catrise's death is unknown, he further claims that no witness saw him with Catrise "near the time of her death." But Catrise was murdered between 9:30 p.m., December 8 (when Williams picked her up from work) and 9:00 a.m., December 9 (when her car was first seen parked on Addington Drive). Her body was found in her car, which was the same car that Williams had picked her up in.

Williams had a motive: Catrise was carrying his child, her pregnancy was a source of tension between them, and she intended to break up with him.

{¶ 52} We reject Williams's claim that there is no physical evidence tying him to the crimes. The presence on the cervical and vaginal swabs of numerous sperm cells with tails intact shows that some person had sexual intercourse with Catrise no more than 24 hours before her death. The presence on Catrise's underwear of semen with DNA consistent with Williams's DNA is evidence that Williams was that person. Moreover, because Catrise practiced good hygiene, it can be inferred that the semen on her underwear got there near the time of her death, rather than three days before—which is when Williams claimed to have last had sex with Catrise.

{¶ 53} Because DNA evidence involves "statistics and probabilities," Williams contends that it is not "actual evidence." We disagree with that conclusion. Williams further claims that the DNA evidence was inconclusive. That is true only with respect to the cervical swab taken during the autopsy, which could only narrow the suspect field down to 25 percent of the male population. But the DNA extracted from Catrise's underwear was consistent with Williams's DNA, and that particular DNA pattern would be consistent with only 1 in 250,000 African–Americans, 1 in 12.4 million Hispanics, and 1 in 33.4 million Caucasians.

{¶ 54} Moreover, Williams told police that he had last had sex with Catrise three days before her death. The physical evidence noted above indicates that Williams lied about this. The trier of fact was at liberty to infer consciousness of guilt from Williams's lie. See *State v. Johnson* (1989), 46 Ohio St.3d 96, 100, 545 N.E.2d 636.

{¶ 55} The nonconsensual nature of the intercourse that occurred within 24 hours of her death was indicated, in part, by the fact that Catrise was murdered soon thereafter. As the United States Supreme Court has observed, being murdered is " 'a fate more frequent among rape victims than friendly sex partners.' " *Calderon v. Thompson* (1998), 523 U.S. 538, 561, 118 S.Ct. 1489, 140 L.Ed.2d 728, quoting *Thompson v. Calderon* (C.A.9, 1997), 120 F.3d 1045, 1073 (Kleinfeld, J., dissenting).

{¶ 56} At trial, Dr. Scala–Barnett, the forensic pathologist who conducted the autopsy, testified that "[w]hen you see a strangulation death in a female, it is our experience that it is more than likely associated with a sexual assault." Further, Dr. Scala–Barnett testified that "in sexual assault victims when the victims are females, the most likely cause of death is strangulation." Thus, the jury could have drawn a reasonable inference from the facts that the intercourse was nonconsensual.

{¶ 57} Catrise also had bruises and other injuries under her upper lip, her nose, ear, chin, and neck. She had no visible injuries when she left work at 9:30

p.m. on December 8. The injuries she suffered certainly permit the inference that the sexual intercourse was nonconsensual.

{¶ 58} Catrise also had a bruise on her labia minora. Like her other injuries, that bruise was inflicted between one and six hours before Catrise's death. Dr. Scala–Barnett testified that that bruise indicates that someone had attempted to penetrate her vagina by force:

{¶ 59} "A. Miss Gregory had a bruise on the labia minora at the 4 o'clock position.

{¶ 60} "* * *

{¶ 61} "A. * * * That's all recent bruise.

{¶ 62} "* * *

{¶ 63} "Q. And what would cause that type of injury?

{¶ 64} "A. Generally we see that kind of injury from attempts at entrance into the vagina.

{¶ 65} "* * *

{¶ 66} "Q. Is it normally associated with sexual activity?

{¶ 67} "A. Not normal sexual activity, no."

{¶ 68} Dr. Scala–Barnett explained that the genital bruising was a sign indicating that the victim had been raped:

{¶ 69} "Q. * * * And what is a rape kit?

{¶ 70} "A. A rape kit is when we take samples, specimens for an evaluation for sexual assault. * * *

{¶ 71} "Q. Was that done in this particular case?

{¶ 72} "A. Yes.

{¶ 73} "Q. And why?

{¶ 74} "A. Because you—*when you see injuries to the genitalia, first of all you are suspicious of sexual assault,* and that is one way to confirm that that activity may have occurred.

{¶ 75} "Q. And was the injury that you saw to the labia minora, was that caused by force?

{¶ 76} "A. That is consistent with being caused by force, yes." (Emphasis added.)

{¶ 77} On cross-examination, Scala–Barnett reiterated that the bruise was an indicator of rape:

{¶ 78} "Q. Would it be fair to say that but for the bruise to the labia, there was [sic] no other indicia of rape or any type—anything like that?

{¶ 79} "A. No. There was [sic] no other stigmata of rape *except for the bruise on the genitalia.*

{¶ 80} "Q. And as relates to the labia and that bruising, you indicated that it is consistent with what?

{¶ 81} "A. Forced entry." (Emphasis added.)

{¶ 82} Moreover, even though Catrise had previously had a sexual relationship with Williams, the evidence shows that their relationship had deteriorated to the point where Catrise was determined to break up with Williams. Williams admitted to police that Catrise had been angry with him on the last night of her life because he had been late picking her up. Finally, there was testimony that Catrise was feeling ill that night because of her pregnancy. All these facts reduce the likelihood that Catrise would have consented to sexual intercourse with Williams.

{¶ 83} Finding the evidence legally sufficient, we turn to Williams's manifest-weight claim. A court considering such a claim "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, paragraph three of the syllabus. See *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 84} Williams challenges the credibility of Detective Mosley's account of his interrogation. His argument centers on Mosley's testimony about his interrogation notes. Mosley testified that he did not take notes when he interviewed Williams but prepared his report 18 months later from memory. Some of the facts that Mosley testified to did not appear in his report. Mosley's supervisor, Sergeant Steve Forrester, testified that Mosley was mistaken: Mosley had taken notes and then used them to write his report. The notes no longer existed at the time of trial because it was "common practice" for officers to dispose of rough notes after writing a report.

{¶ 85} Williams suggests that Mosley's incorrect testimony about the notes, combined with the loss or destruction of the notes themselves, renders the rest of his testimony incredible. However, Detective Scott corroborated Mosley's account of the interrogation. Scott specifically recalled Mosley's asking Williams when he had last had sex with Catrise, and Williams's replying, "Tuesday before she was found." And Forrester, who had read Mosley's notes, testified that they were consistent with Mosley's report and testimony.

{¶ 86} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the convic-

tion." *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717, paragraph three of the syllabus. This is not such a case. Williams's arguments fall far short of demonstrating that the jury lost its way and committed a clear miscarriage of justice. Williams's 12th proposition of law is overruled.

### III. *Miranda* Issue

{¶ 87} Because they did not consider Williams to be "in custody," Detectives Mosley and Scott did not administer *Miranda* warnings to Williams before interviewing him on December 14, 1995. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. In his third proposition of law, Williams contends that the interview was a custodial interrogation, that *Miranda* warnings were therefore required, and that, because no warnings were given, his statements should have been suppressed.

{¶ 88} Pursuant to *Miranda*, statements "stemming from custodial interrogation of the defendant" must be suppressed unless the defendant had been informed of his Fifth and Sixth Amendment rights before being questioned. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 89} However, police are not required to administer *Miranda* warnings to everyone they question, even if the questioning takes place at the police station. *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714. Moreover, "an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody." *Stansbury v. California* (1994), 511 U.S. 318, 319, 114 S.Ct. 1526, 128 L.Ed.2d 293. Instead, the question is whether the suspect has been arrested or restrained from movement to the degree associated with a formal arrest. *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.

{¶ 90} Detectives Mosley and Scott were the only witnesses at the hearing on Williams's motion to suppress. Scott testified that, on December 14, 1995, Mosley asked him to help locate Catrise's boyfriend "so we could talk to him" about Catrise's murder.

{¶ 91} Scott then drove around in an area that he knew Williams frequented. When he saw Williams, Scott pulled over, identified himself as a police officer, and asked Williams whether he would accompany him to the police station, where a detective "wanted to speak to [him] * * * concerning his girlfriend." Williams agreed to come along. During this encounter, Scott did not draw his weapon, tell

Williams that he was under arrest, handcuff him, or force him to accompany him. In fact, Scott never even got out of the car.

{¶ 92} At the station, Williams was not fingerprinted or photographed. Scott and Williams went upstairs to the detective bureau, where they waited for Mosley in a "comfortable" reception area.

{¶ 93} When Mosley arrived, Scott took Williams into a room and asked him to have a seat. Mosley introduced himself and asked Williams whether he knew why he was asked to come to the station. Williams said he did and added that he was "surprised that [Mosley] hadn't tried to interview him before." Mosley asked Williams whether he wanted a drink or needed to use the restroom. Williams turned down both offers.

{¶ 94} Mosley explained to Williams that he was not in custody and was free to leave whenever he wanted. . Williams's movement was not restricted. Although Scott and Mosley were closer to the door than Williams was, the officers were not blocking the doorway. Mosley did not recall whether he and Scott were wearing side arms at this time. (Mosley usually took his weapon off before interviewing a suspect.)

{¶ 95} Mosley then began to question Williams, eliciting the statements that Williams later moved to suppress. The interview ended when Williams asked for an attorney and said that he did not want to talk anymore. Williams's mother or grandmother came to the station to pick him up, and he left.

{¶ 96} As the trial court noted, these facts closely resemble the facts of *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714, supra. In *Mathiason*, the respondent voluntarily came to the station in response to an officer's request. The officer interviewed him in a closed office for half an hour, telling him at the outset that he was not under arrest. After the interview, the respondent left.

{¶ 97} The *Mathiason* court held that the respondent's statements were admissible, finding "no indication that * * * respondent's freedom to depart was restricted in any way. * * * It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714, quoting *Miranda* at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 98} Like the respondent in *Mathiason*, Williams came to the station voluntarily, was not formally arrested, was told before the interview that he was free to leave, and did in fact leave at the close of the interview. Although there are some slight differences between this interview conducted in this case and in *Mathiason*,[1] they do not dilute the analogy.

---

1. Williams's interview was longer than Mathiason's; there were two officers in the room with Williams; and an officer picked Williams up and drove him to the station, whereas Mathiason made his own way to the station.

{¶ 99} Moreover, nothing in the record suggests that the detectives behaved in an overbearing or intimidating fashion. In his brief, Williams states that "[t]wo officers, armed, blocked the exit" to the room. But the detectives testified without contradiction that they did not block the exit. And there was no evidence that the detectives were armed. But even if they were, that fact would not measurably strengthen Williams's argument. Police officers usually carry weapons, and Williams makes no claim that the detectives displayed their weapons in a threatening manner.

{¶ 100} On these facts, the trial court's ruling was clearly correct. Williams's freedom of movement was not restrained. Therefore, he was not in custody, and there was no need to give him *Miranda* warnings. Williams's third proposition of law is overruled.

### IV. Prejudicial Evidence

{¶ 101} Catrise's mother testified that Catrise had intended to carry her pregnancy to term. In his eighth proposition, Williams claims that this testimony was irrelevant and unfairly prejudicial. We disagree. The state was entitled to suggest a possible motive for the murder, and the testimony of Catrise's mother indicated that Catrise's desire to keep her baby was a source of friction between Catrise and Williams: "[T]he relationship didn't seem like it was working out. He [Williams] could not maintain a job. The car issue came up, and like I said, *she wanted to keep her baby and she was going to.*" (Emphasis added.) Williams's eighth proposition is overruled.

### V. Guilt–Phase Prosecutorial Misconduct

{¶ 102} In his ninth proposition, Williams contends that the prosecution committed misconduct in the guilt phase of his trial. However, at trial although Williams objected to one statement, he did not object to the other statements that he now claims were improper. Further, the statements, if error at all, do not qualify as plain error. See, generally, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27–28, 759 N.E.2d 1240. His claims are therefore waived, and his ninth proposition of law is overruled.

### VI. Guilt–Phase Instructions

{¶ 103} In his tenth proposition, Williams alleges two errors in the guilt-phase instructions to the jury. One alleged error involved the following instruction on causation:

{¶ 104} "The causal responsibility of the defendant for an unlawfu[l] act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow in the ordinary course of events from an unlawful act. The test for foreseeability is not whether the

defendant should have foreseen the injury in its precise form. The test is whether a reasonably prudent person in light of all the circumstances would have anticipated that the death of Catrise Gregory was likely to result from the performance of the unlawful act."

{¶ 105} Williams contends that this instruction permits a conviction without a finding of specific intent to kill. We have expressed concern that the standard foreseeability instruction may be confusing in aggravated murder cases. *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819. "The use of that instruction, however, does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643. Here, "[t]he trial court extensively instructed the jury on the requirement of purpose and intent prior to the causation language." *State v. Goodwin* (1999), 84 Ohio St.3d 331, 346, 703 N.E.2d 1251. Thus, the causation instruction was not plain error.

{¶ 106} The second error that Williams alleges regarding the guilt-phase jury instructions involves the reasonable-doubt instruction. We summarily reject this claim of error on authority of *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604.

## VII. Guilt–Phase Ineffective Assistance

{¶ 107} In his 11th proposition, Williams contends that his counsel failed to render effective assistance in the guilt phase. To prevail, Williams must show deficient performance, i.e., performance falling below an objective standard of reasonable representation, and prejudice, i.e., a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

{¶ 108} Williams contends that his counsel should have objected when prospective jurors Tay and Haudan were excused for cause due to their beliefs on the death penalty. Tay initially said that she could not return a death sentence, and then said that she did not know whether she could and that she was "too soft" and "too emotional." Haudan vacillated: at one point he said that he "guess[ed]" he could vote for a death sentence, but he repeatedly said that he did not know whether he could, and he ended by saying that he did not think that he could.

{¶ 109} It was reasonable for counsel not to object to the exclusion of these jurors; since they could not say conclusively whether they were capable of voting to impose the death penalty, an objection would have had little chance of success.

{¶ 110} During voir dire, the prosecutor described mitigating factors to one prospective juror as "the good things that the defense would present on Mr.

Williams's behalf." Williams faults his counsel for not objecting to this statement. However, counsel had no basis to object. Cf. *State v. Tyler* (1990), 50 Ohio St.3d 24, 38, 553 N.E.2d 576 (no basis for objection to court's explanation during voir dire that aggravating circumstances were circumstances that show an offense was "cruel," "heinous," "particularly terrible," or "very bad").

{¶ 111} Williams also contends that counsel should have objected to instructions on causation and reasonable doubt. However, failure to object to the causation instruction was not prejudicial, because the instructions as a whole made clear that the jury had to find purpose to kill in order to convict. Failing to object to the reasonable-doubt instruction was also not deficient performance; such an objection would have been unsupported by existing law.

{¶ 112} Williams contends that counsel should have objected to certain testimony in the state's case-in-chief that he asserts was introduced only to elicit juror sympathy. For example, Catrise's mother testified that Catrise had been "very rebellious" until the age of 15, when she made "a complete turnaround" and began to act like "a normal child," was interested in school, and attended several proms.

{¶ 113} However, not objecting appears to have been a tactical decision by defense counsel, who made their own use of this testimony. Cross-examining Mrs. Gregory, counsel elicited testimony that there had been occasions when Catrise failed to come home at night, and that, at the time of her death, she still had the habit of not coming home when she was upset or did not want to deal with an issue. Defense counsel exploited these points in closing argument: "Mrs. Gregory testified that it wasn't unusual for Catrise not to come home. It wasn't the first time that she had not come home when she was upset * * *. She said that on those occasions when [Catrise] did not come home, * * * she could not tell you that she was with [Williams]."

{¶ 114} Williams also contends that other details about Catrise's life were offered solely to elicit juror sympathy. He points specifically to evidence that Catrise worked and was one of the best employees, she practiced good hygiene, and took care of her appearance.

{¶ 115} But each of these facts was relevant to the issue of Williams's guilt. It was relevant that Catrise worked because she was last seen alive when Williams picked her up from her workplace. The fact that she was a good employee helped narrow the time of her death; Catrise was scheduled to open the Taco Bell on Saturday morning, December 9, but she failed to report to work that morning.

{¶ 116} Finally, Catrise's concern with her appearance and cleanliness was relevant to the issue of rape. Williams told police that he had last had sex with Catrise the Tuesday before her body was found, but semen with DNA consistent

with Williams's was on the underwear that was on Catrise's body. Hence, in order to believe Williams's claim, the trier of fact would have to believe that on Friday Catrise was wearing the same underwear that she had worn on the previous Tuesday. Catrise's habit of cleanliness shows that it was unlikely that she would do that. Cf. *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675 ("Testimony that [the victim] was an immaculate housekeeper was relevant to show that she likely would have wiped [the defendant's] fingerprint off her glasses had he placed it there before the murder"). Thus, the testimony concerning Catrise's habits was relevant to show that Williams lied about the last time that he had had sex with Catrise.

{¶ 117} Because the testimony at issue was relevant to guilt and was not used to elicit the jury's sympathy, it was admissible. See *State v. Williams* (1988), 38 Ohio St.3d 346, 354, 528 N.E.2d 910. Counsel's failure to object to this testimony was not deficient performance, because such objections would have had no merit and would likely have been overruled.

{¶ 118} Williams contends that his counsel should have objected to the "irrelevant" testimony that he did not attend Catrise's funeral or go to the cemetery after the funeral. We find no prejudice. There is no reasonable probability that the outcome of the guilt phase would have been otherwise if Williams had objected to this testimony.

{¶ 119} Williams contends that the state introduced irrelevant testimony regarding his prior arrests and that his counsel did not ask that it be stricken. However, Williams has misread the record. Detective Scott was asked when he had tried to locate witnesses in relation to the murder. He testified, "[F]rom that time to the present time that I believe he [Williams] was arrested, off and on during that time." Defense counsel thought at first that Scott had referred to Williams being arrested "off and on"; however, when the testimony was read back, counsel realized that Scott had been referring to when he was looking for witnesses, and therefore counsel had no objection.

{¶ 120} Williams next contends that counsel should have asked to have juror Daney removed from the jury. Daney was employed in a hospital cardiac unit, and she worked during the trial. The father of state witness Sergeant Forrester was a patient in the cardiac unit, being cared for by Daney. One evening during the trial, Daney had a two-minute conversation with Forrester, who was visiting his father. They talked only about Forrester's father. The state called the occurrence to the court's attention, and the court questioned Daney.

{¶ 121} Daney stated that a recurrence was highly unlikely because she was not going to return to work during the trial and Forrester's father was to be transferred out of her unit. The conversation was not prejudicial; the situation was not going to recur, and Daney said that it would not affect her and pledged

not to discuss the matter with the other jurors. Counsel's decision to let Daney stay did not deprive Williams of a fair trial.

{¶ 122} Williams contends that his counsel failed to put on a sufficient defense because they did not call defense witnesses whom he requested that they call. Latrice Lofton and Tara Morris would have testified that on the night of December 8, 1995, they drove Williams from his cousin's house to Lashon Grover's house. Grover would have testified that Williams visited him that night.

{¶ 123} Defense counsel explained that they did not call these witnesses because their testimony would have partly confirmed Detective Mosley's account of what Williams told him. Williams protested this decision, insisting that he wanted the witnesses to be called.

{¶ 124} Defense counsel's decision not to call the witnesses appears to have been a strategic decision. Moreover, it was a reasonable one. Counsel regarded Mosley's credibility as the "linchpin" of the state's case, and they had impeached it with some success by showing that Mosley testified inaccurately concerning his interrogation notes. Calling the witnesses would have undermined that strategy to some extent.

{¶ 125} In general, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749. See, also, *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 118. Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, supra, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674. The record shows that Williams's counsel investigated, ascertained what the witnesses would say, and made an informed, conscious choice between strategic options. On this record, we do not find that counsel performed deficiently.

{¶ 126} Indeed, Williams concedes that this strategy "might be sound in the proper case." Despite this concession, Williams claims that he received ineffective assistance because counsel disobeyed his instructions to call these witnesses.

{¶ 127} We disagree. "Nonfundamental rights, those rights that primarily involve trial strategy and tactics, are waivable by defense counsel on the defendant's behalf." *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Decisions about what evidence to present and which witnesses to call are in this category and are committed to counsel's professional judgment. Id. See, also, *Brecheen v. Reynolds* (C.A.10, 1994), 41 F.3d 1343, 1368–1369, fn. 22; *United States v. Teague* (C.A.11, 1992), 953 F.2d 1525, 1531; *State v. Dulany* (Mo.1989), 781 S.W.2d 52, 57; *Shelton v. State* (1968), 3 Md.App. 394, 401, 239 A.2d 610; 1 American Bar Assn. Standards for Criminal Justice (2d Ed.1980) 4–65 to 4–66, Section 4–5.2(b). Williams's 11th proposition of law is overruled.

## VIII. Penalty–Phase Issues

{¶ 128} Serious problems arose during the penalty phase of this case. Chief among these was the defendant's physical assault on one of his attorneys and the trial court's subsequent refusal to permit counsel to withdraw from the case. As we shall see, this incident likely resulted in later penalty-phase errors (improper prosecutorial arguments and an erroneous jury instruction) going uncorrected because of counsel's failure to object.

{¶ 129} We find that the prosecutor's misconduct, the erroneous instruction, and the nearly total breakdown of communication between Williams and his counsel combined to render the sentencing in this case fundamentally unfair. The death sentence therefore cannot stand.

### A. Denial of Counsel's Motion to Withdraw

{¶ 130} When the jury returned its guilt-phase verdict, Williams punched Spiros Cocoves, one of his defense attorneys, in the face. The assault happened in the courtroom and in front of the jury. Immediately after the assault, Cocoves indicated that he was willing to continue as Williams's counsel. Shortly thereafter, the court adjourned for the weekend.

{¶ 131} On the following Monday, both Cocoves and his co-counsel, Ronnie Wingate, filed motions to withdraw. Cocoves told the court that during the weekend he had given a great deal of thought to whether he should continue representing Williams. He stated that his relationship with Williams had "eroded" and that Williams was refusing to talk to him. Cocoves asserted that there had been "a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel."

{¶ 132} The judge asked each attorney whether he could fulfill his obligation to represent Williams effectively and zealously. Cocoves said, "[L]acking a definite answer I would have to say that no, I cannot." Wingate stated that he could not "definitively" answer that question either.

{¶ 133} Cocoves explained that he was afraid of Williams and that the assault had "poisoned the relationship." Cocoves indicated that he would not be able to consult with Williams "without some fear of getting popped one, and that [that] fear would almost inevitably be communicated to the jury, which would result in some prejudice to Mr. Williams."

{¶ 134} The trial court nonetheless denied counsel's motions to withdraw. In his second proposition of law, Williams contends that the trial court thereby abused its discretion because the assault had irreparably harmed the attorney-client relationship.

{¶ 135} "An indigent defendant * * * must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles* (C.A.6, 1990), 906 F.2d

1122, 1130. We have indicated that a breakdown in the attorney-client relationship will warrant substitution if the breakdown is so severe as to jeopardize the defendant's right to effective assistance of counsel. *State v. Coleman* (1988), 37 Ohio St.3d 286, 292, 525 N.E.2d 792. See, also, *State v. Cowans* (1999), 87 Ohio St.3d 68, 73, 717 N.E.2d 298. The trial court's decision is reviewed under an abuse-of-discretion standard. *Iles*, 906 F.2d at 1130–1131, fn. 8.

{¶ 136} On the particular set of facts present in this record, we find that the trial court did abuse its discretion in denying counsel's motions to withdraw. Cocoves confessed that he was afraid of Williams, and he had good reason to be. With laudable candor, Cocoves and Wingate each stated that they could not continue to fulfill their professional obligation to their client.

{¶ 137} Indeed, the incident had already begun to diminish the effectiveness of defense counsel. Cocoves and Wingate told the court that they ordinarily would have spent most of the weekend before the penalty phase with their client discussing mitigating factors. Here such discussions were especially important because Williams had previously refused to talk to counsel about mitigation. However, because of the assault, counsel did not contact Williams over the weekend. We note the difficult position in which counsel found themselves. But counsel's inability to discuss the case with Williams exemplifies why the motions to withdraw should have been granted. After the assault, there was a complete breakdown in communications between counsel and client.

{¶ 138} By denying the motions, the trial court put counsel in an untenable position. They had very little communication with Williams, they were frightened of him, and they worried that their fear would be revealed to the jury through their body language when at the defense table with Williams.

{¶ 139} This is particularly damaging to a defendant during the penalty phase of a capital case when counsel must humanize the defendant for the jury, show his character in the best light available, and bring his good qualities to the fore. The attorneys in this case recognized—and demonstrated—that they could not continue to represent Williams zealously.

{¶ 140} On the unique facts of this case, we conclude that the trial court abused its discretion when it failed to recognize that good cause existed to grant counsel's request to withdraw.[2] And the result of that error, as we discuss below, was that Williams was denied the effective assistance of counsel in the penalty phase of his trial.

---

2. Nothing in the record suggests that Williams's misconduct was committed with the purpose of manipulating the trial court to his advantage. Deliberately manipulative behavior by the defendant would call for a different analysis. See *Gilchrist v. O'Keefe* (C.A.2, 2001), 260 F.3d 87, 99, fn. 8.

### B. Penalty–Phase Errors

### 1. Prosecutorial Misconduct

{¶ 141} In his 15th proposition of law, Williams contends that misconduct by the prosecution so tainted the penalty phase that it denied him a fair sentencing proceeding.

{¶ 142} We agree with Williams that extensive prosecutorial misconduct took place. The prosecutor asked the jury to weigh, as aggravating circumstances, a number of facts that are not statutory aggravating circumstances. R.C. 2929.04(A). These nonstatutory aggravating circumstances included the final thoughts of the murder victim, the suffering of the victim's mother, and the death of the victim's unborn child.

{¶ 143} The prosecutor began by telling the jury that it should consider whether the "aggravating circumstance *combined with the nature and circumstances of the crime here outweigh the mitigating factors.*" (Emphasis added.) The state concedes that this argument was improper. Although the jury must consider the nature and circumstances of the crime, it is well settled that the nature and circumstances of the crime may not be weighed against the mitigating factors. See *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 356, 662 N.E.2d 311.

{¶ 144} Next, the prosecutor discussed the suffering of Catrise's mother: "You also have the impact on her family, her mother never going to get to hold her again, her mother never going to get to hold her grandson, because that's part of the facts and circumstances of this crime." The suffering inflicted on Catrise's mother by the murder would not have been admissible if offered as evidence. See, generally, *State v. White* (1999), 85 Ohio St.3d 433, 445–446, 709 N.E.2d 140. The prosecutor's invocation of it in argument was likewise improper. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 679, 687 N.E.2d 1358.

{¶ 145} The prosecutor went on to describe the purported last thoughts and feelings of Catrise herself:

{¶ 146} "[T]his is the person who fathered the child that she was carrying in her womb, puts his hands around her throat and chokes her, and she knows she is dying and she knows she can't do anything to protect her unborn fetus in those 30 seconds to a minute and a half * * *, the person one time she loved but just wanted to get away from, she could not do anything to stop it. She could not protect her child. That's part of the facts and circumstances of this case."

{¶ 147} We have long held that prosecutors may not speculate about what the victim was thinking when she died. See *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071; *Wogenstahl,* 75 Ohio St.3d at 357–358, 662 N.E.2d 311.

{¶ 148} The prosecutor put great stress upon the fact that Catrise's unborn child died with her:

{¶ 149} "He not only killed the 17–year–old girl, very young, but he also killed an unborn male fetus that would have survived, that would have been born. He killed the next generation. That's part of this case too, the victim impact.

{¶ 150} "* * *

{¶ 151} "* * *[H]e made the choice to end the life of the fetus, because he knew she was pregnant.

{¶ 152} "He knowingly killed his next generation, and that's part of the facts and circumstances I think you must consider in this case. * * * That's what you have to put on the side of the board, of the ledger board, where you talk about the *aggravating circumstances* of this case. *That's what you have to weigh against the mitigating factors that have been presented to you.*" (Emphasis added.) The prosecutor thereby expressly told the jury that the nonstatutory circumstances he had discussed in his argument—including the suffering of Catrise and her mother and the death of Catrise's unborn child—were aggravating circumstances. In fact, none of these circumstances are statutory aggravating circumstances. See R.C. 2929.04(A). "[I]t is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are 'aggravating circumstances.'" *Wogenstahl*, 75 Ohio St.3d at 356, 662 N.E.2d 311.

{¶ 153} In his rebuttal argument, the prosecutor returned to the death of Catrise's unborn child: "This chart, he [defense counsel] talks about parole. What parole does, it gives him [Williams] hope. That's something Catrise Gregory doesn't have. That's something her unborn child doesn't have. In fact, at 2029, that child would have been 34 years old, but he didn't even take his first breath."

{¶ 154} We therefore reject the state's claim that the prosecutor made only an "isolated error." Given the brevity of the state's closing arguments,[3] it is not an exaggeration to say that they were dominated by prosecutorial error. And every error had the same tendency: to urge the jury to consider the most emotional aspects of the crime as if those aspects were legitimate aggravating circumstances. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 407–409, 613 N.E.2d 203.

## 2. Instructional Error

{¶ 155} In his 17th proposition, Williams claims that the trial court erred when it instructed the jury that "[m]itigating factors * * * may be considered by you as extenuating or reducing the degree of the defendant's blame or punishment." We agree. As we said in *State v. Bey* (1999), 85 Ohio St.3d 487, 498, 709 N.E.2d

---

3. The prosecutor's closing argument takes up fewer than 13 pages of transcript. His rebuttal takes up about two pages.

484, "Mitigation is not about blame or culpability, but rather about punishment." In *State v. Lawrence* (1989), 44 Ohio St.3d 24, 28–29, 541 N.E.2d 451, we found that a similar penalty-phase instruction referring to blame, combined with other errors, was prejudicial error.

### 3. Plain–Error Analysis

{¶ 156} We realize that defense counsel did not object to the prosecutor's improper comments or to the incorrect instruction. (See our discussion under the heading "Ineffective Assistance of Counsel," which follows.) However, we find that these errors constituted plain error. See, generally, *State v. Barnes*, supra, 94 Ohio St.3d at 27–28, 759 N.E.2d 1240. The errors were obvious: the prosecutor's comments were inflammatory and flagrantly improper, and using the word "blame" in mitigation instructions has been held erroneous since *State v. Lawrence*, supra.

{¶ 157} Moreover, the improper comments and the instruction distorted the jury's understanding of the weighing process: the argument by increasing the number of aggravating circumstances and the instruction by misleading the jury as to the purpose of mitigating factors. Considering that the jury reached its recommended penalty only after first reporting a deadlock, we conclude that these errors, taken together, were outcome-determinative. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

### C. Ineffective Assistance of Counsel

{¶ 158} In his 16th proposition of law, Williams claims that his trial counsel rendered ineffective assistance in the penalty phase. This proposition has merit.

{¶ 159} To begin with, defense counsel failed to object to the obvious prosecutorial misconduct in the closing argument. The state contends that defense counsel may have made a tactical decision not to object to the prosecutor's improper statements. And it is true that declining to object to a closing argument is often a reasonable tactical choice. See, e.g., *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765. It is also true that "[j]udicial scrutiny of counsel's performance must be highly deferential," and we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 160} However, in this case we find that that presumption is overcome by the conduct manifested in the record before us. This was not a case in which counsel merely declined to object to a few instances of misconduct. Here, counsel sat mute through an argument that was dominated by misconduct and laden with the potential for unfair prejudice to the defendant. "From counsel's function as

assistant to the defendant derive[s] the overarching duty to advocate the defendant's cause * * *." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 161} More to the point, counsel made this choice after one of them had been physically assaulted by Williams and after both had admitted having serious misgivings about their ability to continue vigorous advocacy on Williams's behalf. We recognize that defense counsel were in an untenable position after the trial court denied them leave to withdraw. They had to represent a violent, willful, contentious client whom they feared. Yet even such a client is entitled to counsel who "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. On the unusual and compelling facts present in this record, we simply do not find it possible to blandly assume that counsel's inaction, in the face of clear and persistent misconduct, was the product of a conscious tactical decision.

{¶ 162} We further note that counsel failed to object to the incorrect instruction that mitigating factors may be considered to reduce the degree of the defendant's blame. We cannot see any possible advantage to Williams by not asking the trial court to correct this erroneous instruction. Moreover, we must again take into account the depth to which the relationship between counsel and client had sunk after Williams attacked Cocoves. When viewed against that backdrop, counsel's inaction does not appear to have been a tactical decision.

{¶ 163} Having identified these "unprofessional errors," *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674, we turn to the issue of prejudice. At this stage, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "When a defendant challenges a death sentence * * *, the question is whether there is a reasonable probability that, absent the errors, the sentencer * * * would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 164} We believe that such a probability exists. Substantial mitigating factors existed in this case. The nature and circumstances of the offense are mitigating, inasmuch as this appears to have been a crime of passion. The penalty-phase testimony of Williams's mother, grandfather, and two sisters showed that Williams grew up without a father; that Williams nonetheless has a strong, close-knit family that loves him and will stand by him; and that he reciprocated their love and contributed to the family.

{¶ 165} Moreover, the jury struggled to return a recommendation of death. After about six and one-half hours of deliberation, the jurors arrived at what they

thought was a deadlock. After the court told them to review their instructions, the jurors deliberated for about eight and one-half hours longer before reaching unanimity on a recommended sentence.

{¶ 166} Had Williams's counsel not made the errors noted above, it would have been even harder for the jury to recommend death. Counsel could have prevented or neutralized the prosecutor's misconduct by objecting to his improper closing arguments. Had they done this, the jury would not have had nonstatutory aggravating circumstances to weigh against the mitigating factors. Counsel should also have brought to the trial court's attention the erroneous instruction on mitigation.

{¶ 167} While we express no view on whether the aggravating circumstance outweighs the mitigating factors, we find a reasonable probability that the penalty-phase outcome would have been different but for the errors of defense counsel. It follows that Williams did not receive the effective assistance of counsel contemplated by the Sixth Amendment as interpreted by *Strickland*.

{¶ 168} Accordingly, we sustain Williams's 2d, 15th, 16th, and 17th propositions of law. We affirm Williams's convictions of rape and aggravated murder with a rape-murder specification, vacate the sentence of death, and remand the cause for a new mitigation hearing pursuant to R.C. 2929.06.

Judgment affirmed in part,
reversed in part
and cause remanded.

MOYER, C.J., RESNICK, F.E. SWEENEY, SHAW and O'CONNOR, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

STEPHEN R. SHAW, J., of the Third Appellate District, sitting for COOK, J.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 169} I concur in the bulk of the majority opinion. I write separately because of my conviction that appellant should not be subject to a penalty of death on remand.

{¶ 170} Beyond a reasonable doubt, Shawn Williams killed Catrise Gregory. For that unconscionable crime he should be punished severely. However, he should not be sentenced to death, because evidence of rape, the death-penalty specification in this case, is lacking.

{¶ 171} Williams would not be subject to the death penalty absent his conviction for rape. The primary evidence of rape is a doctor's testimony that a bruise on Catrise's labia minora could not have been caused by "normal sexual activity." That seems a bold statement given the wide range of consensual sexual activity

practiced in our society. I find it difficult to believe that the bruise could only have been caused by rape.

{¶ 172} Williams and Catrise had a history of having consensual sex. Given that, I have considerable doubt that the sperm found on a cervical swab and in Catrise's underwear could only have been deposited there as a result of Williams raping her. I do not believe that the circumstantial evidence supports, beyond a reasonable doubt, a conviction of rape and the concomitant death specification. Accordingly, I would reverse Williams's rape conviction and his rape specification conviction and remand the cause for sentencing based solely on the murder conviction.

## APPENDIX

{¶ 173} Proposition of Law No. 1: Because a verdict is final only when it is entered on the journal, a juror may retract her verdict before it is entered on the journal, and when she does, a new trial must be granted.

{¶ 174} Proposition of Law No. 2: Where the attorney client relationship has been irreparably harmed, the trial court must appoint new counsel.

{¶ 175} Proposition of Law No. 3: Where a defendant is summoned off the street, taken back to the police station, questioned in a small room by two officer [sic] sporting their sidearms [sic], [and], the interrogation is custodial in nature, the fact that the defendant was not arrested at that time does not change the nature of the interrogation.

{¶ 176} Proposition of Law No. 4: Jurors who do not unequivocally state that they could not impose the death penalty and can follow the court's instructions may not [be] dismissed for cause juror [sic] under R.C. 2945.25(C) and *Witherspoon v. Illinois* [ (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776].

{¶ 177} Proposition of Law No. 5: A prospective juror in a capital case who indicates that he will follow the court's instructions may not be excused for cause based on his unwillingness to follow the court's instructions, and it is not the court's province to challenge the response of the qualified juror.

{¶ 178} Proposition of Law No. 6: A prospective juror in a criminal case who indicates that he will find police officers especially credible because they are highly trained observers is not impartial and a challenge for cause should be granted.

{¶ 179} Proposition of Law No. 7: The prosecutor may not dismiss a juror merely because of that jurors [sic] hesitation to invoke the death penalty.

{¶ 180} Proposition of Law No. 8: The trial court erred by allowing the jury to consider prejudicially irrelevant evidence.

{¶ 181} Proposition of Law No. 9: Prosecutor may not conjecture about inflammatory subjects not supported by the evidence or address the jury on the subject of victim impact during the culpability determination phase of a capital trial.

{¶ 182} Proposition of Law No. 10: Where the court provides the jury with numerous inaccurate trial phase instructions, a defendant is deprived [of] his protections under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 183} Proposition of Law No. 11: The failure of trial counsel to perform his duties in compliance with the professional norm of a capital litigator constitutes ineffective assistance of counsel.

{¶ 184} Proposition of Law No. 12: Where the jury unreasonably relies upon evidence that is clearly not credible to sustain a conviction against a defendant, a reviewing court must reverse the tainted convictions and order a new trial.

{¶ 185} Proposition of Law No. 13: The trial court may not hold hearings during the trial without the presence of the defendant. Such action is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 186} Proposition of Law No. 14: Where a defendant waives mitigation or refuses to assist in its preparation a trial court must conduct a hearing to ensure the waiver is valid and refer the defendant for a competency evaluation to ensure the validity of the waiver.

{¶ 187} Proposition of Law No. 15: Pervasive prosecutorial misconduct during opening statement and closing argument at the mitigation phase of a capital trial denies a defendant his rights to fair trial and due process and to be free from cruel and unusual punishment.

{¶ 188} Proposition of Law No. 16: Trial counsel provide their client with constitutionally ineffective assistance at the mitigation phase of a capital trial when they allow their personal feelings about the client to interfere with their professional duty, fail to pursue mitigation investigation and when they fail to object to egregious misconduct on the part of the prosecutor during closing argument.

{¶ 189} Proposition of Law No. 17: A trial court's inaccurate penalty phase instructions misguide the jury as to their duties under the law rendering the resultant sentence unreliable and violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 190} Proposition of Law No. 18: When a jury at the mitigation phase of a capital trial is deadlocked on the death sentence, the court must instruct it to

move on and determine which life sentence to impose; when the deadlock is total, the court itself must impose a life sentence on the defendant.

{¶ 191} Proposition of Law No. 19: Ohio's death penalty law does not genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of that penalty on a defendant when the defendant is the only alleged participant in the crime, is convicted of felony aggravated murder, R.C. 2903.01(B), and the only death penalty specification is that the murder was committed during the course of the same underlying felony.

{¶ 192} Proposition of Law No. 20: A trial court denies a capital defendant his rights to due process under the constitutions of the United States and the State of Ohio when it fails to conduct an inquiry as to whether he knowingly and intelligently waived his right to testify at trial.

{¶ 193} Proposition of Law No. 21: In order to comport with due process, the right to meaningful appeal, and avoid cruel and unusual punishment, the universe of cases to be examined for review of proportionality must include all those in which a capital specification has been charged.

{¶ 194} Proposition of Law No. 22: Residual doubt must be available as a mitigating factor in a capital trial in order to assure protection of the defendant's constitutional rights to due process and a fundamentally fair proceeding as well as his constitutional protections against cruel and unusual punishment.

{¶ 195} Proposition of Law No. 23: Ohio's death penalty law is unconstitutional both in the abstract and as applied.

---

Julia R. Bates, Lucas County Prosecuting Attorney, and Craig T. Pearson, Assistant Prosecuting Attorney, for appellee.

Jeffrey M. Gamso and David L. Doughten, for appellant.