[Cite as *State v. Wright*, 2015-Ohio-3118.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | Case No. 14CA3457 |
| v. | : | |
| | : | DECISION AND |
| JEREMY A. WRIGHT, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | RELEASED 07/31/2015 |

APPEARANCES:

Timothy Young, Ohio Public Defender, and Valerie Kunze, Assistant Ohio Public Defender, Columbus, Ohio, for Appellant.

Matthew S. Schmidt, Ross County Prosecuting Attorney, and Cynthia G. Schumaker, Assistant Ross County Prosecuting Attorney, Chillicothe, Ohio, for Appellee.

Hoover, P.J.

{¶ 1} Defendant-appellant, Jeremy A. Wright ("Wright"), appeals his conviction from a bench trial in the Ross County Common Pleas Court. The trial court found him guilty of the offense of domestic violence, a felony of the third degree in violation of R.C. 2919.25. On appeal, Wright contends that (1) he received ineffective assistance of counsel; (2) his conviction was not supported by sufficient evidence; and (3) his conviction was against the manifest weight of the evidence. We find that Wright did not receive ineffective assistance of counsel; therefore, Wright's first assignment of error is overruled. We also find that Wright's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. As a result, Wright's second and third assignments of error are overruled. Accordingly, we affirm the judgment of the trial court.

## I. FACTS

{¶ 2} In June 2014, the Ross County Grand Jury indicted Wright on one count of domestic violence, a violation of R.C. 2919.25, a third degree felony. The indictment arose from an incident that occurred on November 3, 2013, between Wright and Tiffany Dearth ("Dearth").

{¶ 3} Wright pleaded not guilty to the charge and later waived his right to a jury trial. Wright's case was tried to the bench on August 14, 2014. At trial, the State called two witnesses, Dearth and officer Michael Short. The defense called Wright to testify on his own behalf.

{¶ 4} Dearth testified that she had known Wright since May 2013 and started dating him in June 2013. During the summer of 2013, beginning in June or July, Dearth visited Wright's grandmother's residence at an assisted living facility[1] on the east side of Columbus, Ohio. Dearth had visited the facility at least five times. While she was at the facility, she observed signs that read "assisted living" and she observed nurses at the facility. Dearth stated that Wright did not have a bedroom at his grandmother's residence because "there's only one bedroom for his grandma because nobody else can live there." Dearth did say that she might have seen Wright's coat and a pair of his jeans at his grandmother's residence.

{¶ 5} According to Dearth, on August 25, 2013, Dearth and Wright moved into a trailer in Londonderry, Ohio; and they lived at the trailer until October 29, 2013. When questioned about her living arrangements with Wright, Dearth stated that they were not just roommates, but were boyfriend and girlfriend and engaged in sexual relations during the time they lived together. According to Dearth, she signed a rental agreement[2] for the Londonderry property. Dearth

---

[1] Dearth at first testified that the name of the assisted living facility where Wright's grandmother lived was "The Woods at Parkside"; but on rebuttal, Dearth testified that the name of the facility was actually "Woodlands at Eastland."

[2] The State attempted to elicit testimony from Dearth regarding the rental agreement that purportedly listed both names (Dearth and Wright) for persons who would be residing at the residence; however, the State had apparently not disclosed the document to Wright until the morning of the trial. Therefore, upon objection of Wright's attorney, the trial court refused to allow the State to introduce the document. However, the trial court did allow Dearth to

conveyed her intentions to the landlord that she and Wright would be residing in the trailer. Dearth contended that Wright slept at the residence every night and kept his clothes, shoes, and personal belongings at the residence. Dearth added that Wright kept his body wash and razor in the bathroom. As for contributions to the household, Dearth stated that Wright bought a sectional couch for the living room[3]; that he would obtain food for the two of them by using his food card or "EBT food stamp"; and that he did household duties like cooking and cleaning.

{¶ 6} Dearth further testified that she worked at Granny's Pizza, which was right beside where she and Wright lived. Dearth explained that only one set of keys had been issued to them. This was because they only needed one set since Wright was not employed; and he mostly stayed at the residence. Dearth also testified that she had a vehicle and that she and Wright shared the vehicle.

{¶ 7} At the end of October 2013, Dearth could no longer afford the rental payment for the trailer, so Dearth and Wright moved out of the residence. Dearth then stayed at the home of her friend, Keshia[4] Pitts ("Pitts"), who lived in Chillicothe, Ohio. On November 3, 2013, Dearth was staying at Pitts's home. Dearth testified that prior to Wright coming to Pitts's home, she had talked with him about separating because he made no financial contributions; and she could not do it all by herself. Dearth stated that Wright did not want to separate and that he made physical threats to her.

{¶ 8} As claimed by Dearth, she asked Pitts to talk with Wright requesting that he bring the keys to the rental property and Dearth's car keys and cell phone to Dearth. Apparently, Pitts

---

identify the document and testify about the circumstances of her alleged cohabitation with Wright. Dearth was not permitted to testify about the contents of the document.
[3] Wright's trial attorney elicited testimony during cross-examination of Dearth that Wright had purchased the couch from the landlord Mike Johnson. According to Dearth, both Mike Johnson and Wright told her that Wright purchased the couch.
[4] Ms. Pitts's name was spelled as "Keshia" and "Kiesha" in the transcript of the proceedings. We have used the first spelling of "Keshia" in this decision.

did contact Wright because he arrived at Pitts's residence around 8:30 p.m. with the requested items. When Wright arrived he knocked on the door, but Dearth was afraid to come out because of the earlier physical threats. Eventually though Dearth did go out onto the porch; and Wright threw the car keys, rental property keys, and her phone into the grass in front of Pitts's home. When Dearth went to grab the phone and the keys in the grass, Wright attacked her. Wright tackled her, ripped her shirt, straddled her, and began choking and slapping her. Dearth claimed that Wright hit the side of her neck and just kept choking her. Dearth testified that Wright was positioned on top of her for three to four minutes. Dearth said that she felt like she was going to pass out while she was being attacked because she could not breathe. Wright was threatening to kill Dearth and was calling her names. Pitts came out with a bat and told Wright to leave and that she was going to call law enforcement. Wright then left in a white car. Pitts recorded the license plate number and called it in to law enforcement.

{¶ 9} An officer with the Chillicothe Police Department, Officer Michael Short, responded to Pitts's call. Officer Short took the statements of Dearth and Pitts and took pictures of Dearth. Officer Short also testified at the trial. He observed that Dearth's shirt was ripped and that she had redness on her neck and chest area. Although Dearth had red marks on her neck, she did not seek medical treatment. The photographs of Dearth's injuries were authenticated through the testimony of Officer Short; and four of the photographs were admitted into evidence.

{¶ 10} Dearth had also claimed that Wright initiated contact with her at the end of December 2013 through social media on Facebook. Wright apologized to Dearth and convinced her that he made a mistake. Wright told her that "it would never happen again" and that he loved her. Dearth and Wright began seeing each other again. By January 26, 2014, though, Wright forced Dearth to make videos on her phone stating that she was lying about the whole incident.

Wright threatened Dearth that he was going to "tie [her] up, put [her] in a closet, not let [her] out" and "he was going to kill [her]" if she did not make the videos. Wright also threatened Dearth that his friend Joy would also beat her up if she did not make the videos. Wright had Dearth contact Officer Short and the Law Director's office to tell them that "it didn't happen." Dearth testified that later she did report the information regarding the videos to the Ross County Prosecutor.

{¶ 11} After making the videos, Dearth convinced Wright that she was very sick and having seizures and that she needed to go to a hospital. Dearth testified that this was the only way that she could get away from him. Wright would not take Dearth to Adena Hospital. He wanted to get out of Chillicothe; so he took her to Grant Hospital in Columbus, Ohio. Wright was with Dearth during the whole time she was in the emergency room. Once Dearth was given her room, she was able to talk to her nurse and tell her what happened. They made Wright leave her room.  Wright ran out of the hospital and left in Dearth's car. She was given a private unit because Wright attempted to come back in the hospital several times. The police or security officers chased Wright out of Grant. Dearth spent three days at Grant and was released on January 29, 2014. When she was released, she took a cab to her grandmother's home in Columbus; and the next day, Dearth's parents picked her up and took her back to their home in Londonderry. Dearth did not report any of these events to law enforcement. Dearth explained that she was scared and she just did not know to report the events since she had never been in any kind of trouble and had never done this.

{¶ 12} Wright presented a different version of the events. Wright argued that he did not live with Dearth. He stated that he did not have a set of keys to the trailer; and he did not sign any rental agreement for the trailer. Instead, Wright contends that he used his grandmother's

address in Columbus, Ohio, as his residence. Wright stated that he had lived with his grandmother for two years ever since he was released from SEPTA for a conviction he received in Fairfield County. Wright admitted that he did not have a bedroom at his grandmother's residence; but he claimed that he slept on a couch that folds out into a bed. Wright claimed that his probation records in Fairfield County reflected the Columbus address as his residence. On cross-examination, however, Wright could not give the name of the facility in which his grandmother resided. He could only give the name of the road on which the facility was located. Wright admitted that he had no documents with him at trial that showed his address as the Columbus address.

{¶ 13} Wright characterized his relationship with Dearth as "we were just partying." Wright testified that although he was sleeping with Dearth, he did not consider himself and Dearth to be dating. In fact, Wright claimed that Dearth was dating someone else by the name of Jamie Barrows[5]. When Dearth and Barrows would fight and argue, Dearth would beg and call Wright to come down. Wright testified that he would "come down overnight or so" to the trailer in Londonderry but he "would immediately go back home" in case his probation officer checked on him. Wright testified that he was not supposed to leave Franklin County since he was on probation through Fairfield County. Wright admitted to staying the night but he contended that he would leave the next night. Wright claimed that he never used the Londonderry address as his address and that he never received mail at that address. He claimed that he never kept anything at her trailer; but he would have his "own little personal bag" with an outfit to change into the following day and a toothbrush. He admitted to driving Dearth's vehicle; however, he argued that he drove it because Dearth suffered from seizures.

---

[5] Dearth testified that she and Mr. Barrows were only friends and that she never lived with Mr. Barrows.

{¶ 14} Wright contended that he made no contributions to the household. He claimed that he did no household chores at the residence. Wright denied that he purchased the couch for the trailer in Londonderry. He claimed that he only helped move the couch into the trailer. Wright testified that he was not employed during August 2013 through October 2013; thus, he had no money to purchase the couch. He did admit that he would share food that he bought with his food stamps with Dearth. On cross-examination, Wright admitted that he picked up his food stamps from the Western Avenue location in Ross County, Ohio. The food stamps were not sent to the address in Columbus that Wright claimed as his residence.

{¶ 15} Not only did Wright claim that he did not live with Dearth in a boyfriend-girlfriend relationship, but he also asserted that the events of November 3, 2013, occurred differently than Dearth presented. Wright testified that Dearth still had his I.D.; and he wanted to retrieve it. Likewise, Wright had Dearth's cell phone; and she wanted it. Thus, Wright, along with some friends, pulled up to Pitts's residence and asked Dearth to bring out his I.D. Dearth would not come out; so Wright jumped out of the car to get it. Wright got his I.D. and returned Dearth's cell phone. Pitts then chased him to the car and got the license plate number; Wright and his friends then left. Wright contended that no physical confrontation occurred between Wright and Dearth on November 3, 2013.

{¶ 16} Wright also portrayed the events that occurred after November 3, 2013, quite differently than Dearth's version of events. Wright claimed that Dearth contacted him and wanted to "tag along" with him. He claimed that Dearth wanted to go talk to Officer Short and "commit the truth"; but that when Officer Short mentioned falsification charges, Dearth "got scared and said she'd never been to jail." Wright's friends then proposed the idea of creating a video to exonerate Wright. Wright testified that he never threatened Dearth or forced her to make

the video. After making the video, Wright admitted to driving Dearth to the hospital in

Columbus because Dearth was having a seizure. Wright asserted that they went to Grant Hospital

because it is known for giving prescriptions to people. Dearth was admitted to the hospital; and

when she went to her room, Wright left.

{¶ 17} Wright testified regarding his criminal history also. Wright had two domestic

violence convictions involving his baby's mother; Wright also mentioned a conviction he

received for "protecting [his] mother." This was a conviction for aggravated assault, a felony of

the fourth degree. Wright also stated that he had been in trouble for assault or disorderly conduct

and had two convictions for theft.

{¶ 18} The parties stipulated to Wright's prior convictions for domestic violence. Two

sentencing entries for the prior convictions were stipulated to and entered into evidence.

{¶ 19} The trial court found Wright guilty of domestic violence and sentenced him to a

prison term of eighteen months. It is from this conviction and sentence that Wright now brings

his timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Wright assigns the following errors for our review:

First Assignment of Error:

> TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL,
> IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO
> CONSTITUTION. *Strickland v. Washington* 466 U.S. 668, 104 S. Ct. 2052
> (1984). T. pp. 1-161.

Second Assignment of Error:

> JEREMY WRIGHT'S CONVICTION FOR DOMESTIC VIOLENCE WAS
> NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF MR.
> WRIGHT'S RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND
> FOURTEENTH AMENDMENTS TO THE UNITED STATES

CONSTITUTION, AND SECTION 10, ARTICLE I OF THE OHIO
CONSTITUTION. August 21, 2014 Entry; T. pp. 4-85

Third Assignment of Error:

JEREMY WRIGHT'S CONVICTION FOR DOMESTIC VIOLENCE WAS
AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION
OF MR. WRIGHT'S RIGHT TO DUE PROCESS OF LAW UNDER THE
FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION, AND SECTION 10, ARTICLE I OF THE OHIO
CONSTITUTION. August 21, 2014 Entry; T. pp. 4-141.

{¶ 21} For ease of analysis, we will address the second and third assignments of error

prior to addressing the first assignment of error.

III. LAW AND ANALYSIS

A.  Sufficiency and Manifest Weight of the Evidence

{¶ 22} Wright argues in the second assignment of error that his conviction was not

supported by sufficient evidence and in his third assignment of error that the conviction was

against the manifest weight of the evidence. "The legal concepts of sufficiency of the evidence

and weight of the evidence are both quantitatively and qualitatively different." *State v.*

*Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing the sufficiency of

the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether

the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt."

*State v. Davis,* 4th Dist. Ross No. 12CA3336, 2013–Ohio–1504, ¶ 12. "The standard of review is

whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the

light most favorable to the prosecution, any rational trier of fact could have found all the

essential elements of the offense beyond a reasonable doubt." *Id.,* citing *Jackson v. Virginia,* 443

U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Therefore, when we review a sufficiency

of the evidence claim in a criminal case, we review the evidence in a light most favorable to the

prosecution. *State v. Hill,* 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶ 23} In the case sub judice, Wright was charged with domestic violence, a violation of R.C. 2919.25. Because Wright had been previously convicted of two or more offenses of domestic violence, the degree of the offense was a third degree felony. The elements of the offense were set forth in the indictment as follows:

> That Jeremy A. Wright, on or about the 3rd day of November, 2013, in the
> County of Ross, aforesaid did knowingly cause or attempt to cause physical harm
> to another, a family or household member, the said Jeremy A. Wright having been
> previously convicted of two (2) or more offenses of Domestic Violence, to wit:
> Domestic Violence, Section 2919.25 of the Ohio Revised Code, in the Court of
> Common Pleas, Ross County, Ohio, on or about the 3rd day of October, 2005,
> and two (2) counts of Domestic Violence, Section 2919.25 of the Ohio Revised
> Code, in the Court of Common Pleas, Ross County, Ohio, on or about the 16th
> day of September, 2005, in violation of Section 2919.25 of the Ohio Revised
> Code and against the peace and dignity of the State of Ohio.

{¶ 24} As for the element of the prior convictions, the parties stipulated to Wright's prior convictions for domestic violence. As a result, the two sentencing entries for the prior convictions were entered into evidence. Consequently, any rational trier of fact could have found this element of the offense beyond a reasonable doubt.

{¶ 25} Dearth and Officer Short both testified to the date of the offense being November 3, 2013, and that the offense occurred in Ross County, Ohio. Wright did not contest these elements of the offense. Therefore, any rational trier of fact could have found these elements of the offense beyond a reasonable doubt.

{¶ 26} Wright did contest the element of the offense that he was a "family or household member" of Dearth by testifying that he did not live with her. However, Dearth provided ample testimony that she and Wright lived together in the trailer in Londonderry, Ohio. Dearth testified that she conveyed to the landlord that she and Wright would be residing in the trailer. Dearth contended that Wright slept at the residence every night and kept his clothes, shoes, personal belongings, body wash, and razor at the residence. She further testified that Wright contributed to the household by sharing food with her that he obtained through his food stamps. In addition, Wright also contributed by doing household chores while Dearth worked at a pizza place next to their trailer. They also shared a vehicle owned by Dearth. Dearth also testified that she and Wright were boyfriend and girlfriend and that they engaged in sexual relations. Wright claimed that he lived in Columbus with his grandmother at the assisted living facility; but his argument is simply not credible. Wright was not even able to provide the name of the assisted living facility during his cross-examination. Wright even admitted that he did not have a bedroom or a bed at the facility. As a result, when reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the element that Wright and Dearth were family or household members beyond a reasonable doubt.

{¶ 27} Wright also claimed that he did not knowingly cause or attempt to cause physical harm to Dearth. Again, Dearth provided adequate evidence that Wright harmed her. Dearth testified that when she went to grab the phone and the keys in the grass, Wright attacked her.

Wright tackled her; ripped her shirt; straddled her; choked her, hit the side of her neck, and slapped her. Dearth testified that she could not breath while she was being choked; and she felt like she was going to pass out. Dearth also claimed that Wright called her names and threatened to kill her. To support her allegations, the photographs that were taken by Officer Short and admitted into evidence indeed showed redness in her neck area. In contrast, the version of the facts that Wright presented to the trial court seemed to leave out a lot of detail. He testified that he pulled up to Pitts's residence and asked Dearth to bring out his I.D. When Dearth would not come out, he jumped out of the car to get the I.D. Wright claimed that he returned Dearth's cell phone but he did not explain how he returned it. Wright contends that Pitts chased him to the car but does not explain why he was chased to his car. Wright argues that he simply left and that no physical confrontation occurred between Wright and Dearth.

{¶ 28} Upon evaluating the testimonies of the parties in a light most favorable to the prosecution, any rational trier of fact could have found that Wright did knowingly cause or attempt to cause physical harm to Dearth beyond a reasonable doubt. We find that reasonable minds could reach the conclusion that the trial court reached here. Wright's conviction was supported by sufficient evidence. His second assignment of error is without merit and is hereby overruled.

{¶ 29} " 'Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.' " *State v. Topping,* 4th Dist. Lawrence No. 11CA6, 2012–Ohio–5617, ¶ 60, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. "When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of

witnesses." *Id*. "The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve." *Id*., citing *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001), and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  This is so because "[t]he trier of fact 'is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Pippen,* 4th Dist. Scioto No. 11CA3412, 2012–Ohio–4692, ¶ 31, quoting *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 30} "Once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Quotations omitted.) *Davis*, 2013-Ohio-1504, at ¶ 14.

{¶ 31} If the prosecution presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, the judgment of conviction is not against the manifest weight of the evidence. *State v. Cooper*, 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493, ¶ 16 (4th Dist.). A reviewing court should find a conviction against the manifest weight of the evidence " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *see also State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 32} We cannot find that the fact-finder, when resolving the conflicts in evidence, clearly lost its way and created a manifest miscarriage of justice. We find, rather, that Wright's

conviction for domestic violence was not against the manifest weight of the evidence. Consequently, we overrule Wright's third assignment of error.

B. Ineffective Assistance of Counsel

{¶ 33} In his first assignment of error, Wright contends that he received ineffective assistance of counsel from his trial attorney. Specifically, Wright contends that he received ineffective assistance of counsel because (1) his attorney only presented Wright as a witness and failed to present corroborating evidence as part of Wright's defense; and (2) his attorney did not make a Criminal Rule 29 motion for acquittal.

{¶ 34} Criminal defendants have a right to counsel, including a right to the effective assistance from counsel. *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), fn. 14; *State v. Stout,* 4th Dist. Gallia No. 07CA5, 2008–Ohio–1366, ¶ 21. To establish constitutionally ineffective assistance of counsel, a criminal defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006–Ohio–2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008–Ohio–968, ¶ 14.

{¶ 35} "When considering whether trial counsel's representation amounts to deficient performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Walters,* 4th Dist. Washington Nos. 13CA33, 13CA36, 2014–Ohio–4966, ¶ 23, quoting *Strickland* at 689. "Thus, 'the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " *Id.*, quoting *Strickland* at 689. " 'A properly licensed attorney is presumed to execute his duties in an ethical and competent manner.' " *Id.*, quoting *State v. Taylor,* 4th Dist. Washington No. 07CA1, 2008–Ohio–482, ¶ 10. "Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment." *Id.*

{¶ 36} Wright argues that he received ineffective assistance of counsel because his trial attorney did not present corroborating evidence as part of the defense in his case. Wright argues that the trial court indicated that other evidence would have clarified the issues. Wright states that the trial court suggested that multiple witnesses could have clarified the issues. The witnesses that the trial court mentioned were Keshia Pitts, Mike Johnson, and a witness regarding the alleged Columbus residence of Wright.

{¶ 37} Decisions about which witnesses to call involve matters committed to counsel's professional judgment. *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 127; *see also State v. Jackson*, 4th Dist. Lawrence No. 97CA2, 1997 WL 749480, *2 (Dec. 5, 1997) ("Generally, decisions to call witnesses is within the purview of defense counsel's trial strategy and is not considered deficient performance absent a showing of prejudice."). Stated differently "counsel's decision whether to call a witness falls within the rubric of trial strategy

and will not be second-guessed by a reviewing court." *Treesh,* 90 Ohio St.3d at 490, 739 N.E.2d 749.

{¶ 38} Wright's trial counsel may have concluded that calling other witnesses would be ineffective and only serve to reinforce the credibility of the testimony presented by the State of Ohio. Similarly, counsel's decision to not present other witnesses may have been sound trial strategy. Counsel may have legitimately determined that calling other witnesses would only serve to hinder Wright's version of events.

{¶ 39} For instance, it is likely that any testimony Pitts would give would have been favorable to the State of Ohio. After all, Dearth testified that Pitts was the person who came out of her house with a bat; told Wright to leave; wrote down the license plate of the vehicle; and called law enforcement. The State had actually filed a praecipe for issuance of a subpoena for Pitts; but it was not served upon her as she was "no longer living at the address." Similarly, if the landlord, Mike Johnson, had been called to testify by Wright's trial counsel, it is likely that Johnson would have bolstered Dearth's testimony, not Wright's testimony. Johnson would more than likely have testified that Dearth indeed conveyed to him that Wright would be living with her in the trailer. Also, Johnson would probably have verified that Wright purchased the couch from Johnson for the trailer. Lastly, if someone from the assisted living facility testified regarding Wright's alleged Columbus address, it is also likely that he or she would have testified that only the grandmother was permitted to live in the assisted facility. It is highly unlikely that an employee from the assisted living facility would testify that Wright, who had been convicted various crimes, resided in the facility.

{¶ 40} It is clear to us that the decision of Wright's trial counsel not to call other witnesses was indeed trial strategy. We will not second-guess trial counsel's decision here. Wright's trial counsel did not act deficiently for failing to call other witnesses.

{¶ 41} Wright also claims that he received ineffective assistance of counsel when his trial counsel failed to hold the State to its burden of production by not making a motion for acquittal pursuant to Crim.R. 29. A Crim.R. 29(A) motion tests the sufficiency of the evidence presented at trial. *State v. Volgares,* 4th Dist. Lawrence No. 98CA6, 1999 WL 354339, *4 (May 17, 1999), citing *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), and *State v. Miley*, 114 Ohio App.3d 738, 742, 684 N.E.2d 102 (4th Dist.). Because we find that sufficient evidence existed to convict Wright of domestic violence, we find his argument that he received ineffective assistance of counsel for his trial counsel's failure to make a Crim.R. 29 motion to be without merit.

{¶ 42} Lastly, none of the alleged instances of ineffective assistance, either individually or collectively, were prejudicial. To maintain his ineffective assistance of counsel argument, Wright must demonstrate it was reasonably probable that, but for his trial counsel's errors, the verdict would have been otherwise. Wright's argument that calling other witnesses for corroborating evidence would have changed the outcome of the case is mere speculation. Moreover, Wright fails to explain how trial counsel's failure to call witnesses prejudiced him. Also, trial counsel's failure to make a Crim.R. 29 motion for acquittal would have been denied had it been made since the trial court found sufficient evidence to convict him. In light of the record, Wright has not shown that, but for his trial counsel's alleged errors, a reasonable probability exists that the trial court would have found him not guilty.

{¶ 43} Based on the foregoing, we overrule Wright's first assignment of error.

## IV. CONCLUSION

{¶ 44} Having overruled each of Wright's assignments of error for the reasons stated above, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court. If a stay is continued by this entry, it will terminate at the earliest of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to the expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. and Abele, J.: Concur in Judgment and Opinion.

For the Court

By:_____
                    Marie Hoover
                    Presiding Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.