[Cite as *State v. Whatley*, 2020-Ohio-763.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JAMES WHATLEY,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 19 JE 0004**

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 16-CR-145 and 18-CR-77

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin*, Jefferson County Prosecutor, Jefferson County Justice Center, 16001 State Route 7, Steubenville, Ohio  43952, for Appellee and

*Atty. Aaron Miller,* Aaron Miller Law Office, LLC, 329 North Fourth Street, Steubenville, Ohio 43952, for Defendant-Appellant.

Dated: February 26, 2020

---

**D'APOLITO, J.**

**{¶1}** Appellant James J. Whatley, Jr. appeals his conviction by the Jefferson County Court of Common Pleas following a jury trial for one count of discharging a firearm at or into a habitat, in violation of R.C. 2923.161(A)(1), a felony of the third degree; one count of tampering with evidence, a violation of R.C. 2921.12(A)(1), a felony of the third degree; and one count of having a weapon while under disability, a violation of R.C. 2923.13(A)(3), a felony of the third degree. In his sole assignment of error, Appellant contends that his trial counsel provided ineffective assistance because she did not challenge a police officer's identification of Appellant from a surveillance pole video camera located in the area where two residences sustained bullet holes, and she did not object to the same police officer's testimony that Appellant refused to provide a statement following his arrest. Based on the evidence in the record, Appellant has not demonstrated that his trial court's performance was deficient or that he suffered any prejudice, and his conviction is affirmed.

## FACTS

**{¶2}** Following a series of 9-1-1 calls reporting "shots fired" in the Pleasant Heights section of Steubenville, Ohio on April 26, 2018, Captain Joe Buchmelter was dispatched to the area of Plum Street and State Street at approximately 4:40 a.m. At 5:02 a.m., he encountered Appellant and another man walking down Adams Street, which is in the neighborhood of Plum and State. Adams Street was deserted but for Appellant and the other man.

**{¶3}** When Captain Buchmelter attempted to converse with them, they both fled. However, Captain Buchmelter was able to apprehend Appellant because his low-slung pants caused him to trip and fall when Office Buchmelter gave chase. The second man, later identified at Tyler Pesta, was never apprehended. Appellant was arrested by Captain Buchmelter and taken into custody.

**{¶4}** During a search incident to arrest, Captain Buchmelter found an unspent 9mm casing in Appellant's pocket. Appellant told Captain Buchmelter that the pants he

Case No. 19 JE 0004

was wearing did not belong to him.  Appellant explained at trial that he had lost 110 lbs. and was wearing his brother's pants.

{¶5}  On Captain Buchmelter's orders, officers retraced Appellant's path and recovered a Helwan Luger 9mm semiautomatic pistol ("Luger") on the sidewalk of Adams Street, at the same location where Captain Buchmelter first encountered Appellant and Pesta.  When Captain Buchmelter informed Appellant that the Luger had been found, Appellant said, "You won't find my fingerprints on it."  (*Id.* at 132.)

{¶6}  Captain Buchmelter performed a gunshot residue test on Appellant's hands. Captain Buchmelter testified that he did not recall whether Appellant told him that he had been setting off fireworks several hours before he was apprehended.  As a consequence, Captain Buchmelter did not record any use of fireworks on the gunshot residue information report that accompanied the kit to BCI.

{¶7}  During their investigation at the crime scenes, officers found an unspent 9mm casing outside of the residence at 1219 State Street, as well as three bullet fragments that had penetrated the dwelling.  A second residence, 1203 Plum Street, had been struck seven times, and nine spent casings and one unspent casing were found at the scene.  A fourth unfired 9mm casing was found in Appellant's pants pocket when he passed through the scanner at the police station.

{¶8}  Initially, Appellant denied having any relationship with or even knowing the identity of the other man.  Appellant also denied discarding the Luger on Adams Street, and having any involvement in the crimes that occurred on State and Plum.  Appellant told Captain Buchmelter that he was "at a shorty's (female friend) house" when the "shot fired" calls were received, but he refused to provide her name.  (*Id.* at 132-133.)

{¶9}  After the 9-1-1 calls were logged, dispatchers immediately reviewed video from surveillance pole cameras in the area of Plum and State, which captured Appellant and Pesta walking down the Maxwell Avenue just prior to the 9-1-1 calls.  In the pole camera videos, Appellant had what appeared to be a gun in his hand.

{¶10} The police investigation revealed additional circumstantial videotape and photographic evidence implicating Appellant in the crimes, which included a cellular telephone video of Appellant taunting rival gang members taken by Appellant and Pesta that same evening on Maxwell Avenue, and photographs of Appellant in the Pleasant

Avenue area taken roughly ten days prior to April 26, 2018. Two of the photographs depict Appellant brandishing the Luger in front of 1203 Plum Street – one of the residences that sustained gunfire on April 26, 2018. There is also a photograph of Appellant brandishing the Luger in front of 1215 Plum Street, which Appellant explained at trial was taken because he believed at first and in error that a rival gang member stayed at that residence. A fourth photograph depicts Appellant brandishing the Luger in one hand, a .380 caliber handgun in his other hand, and a TEC-9 suspended from a cord around his neck. The photograph was taken in the basement of a residence in the south end of Steubenville. Additional videos from April 26, 2018 were taken on the south end and depict Appellant singing, dancing, and "throwing up gang signs" with another handgun and a TEC-9.

{¶11} Other evidence included the content of a social media exchange between Appellant and Pesta via Facebook Messenger on April 25, 2018, which appears to document their plans to undertake some unidentified criminal activity the following day. The relevant portion of the exchange reads:

> Pesta: You tryna do that one thing tomorrow I'll grab the tools from my moms.
>
> Appellant: Yea.
>
> Pesta: Say no more.
>
> Appellant: 100/100.

Finally, the gunshot residue test revealed traces of gunpowder on Appellant's hands.

{¶12} On October 11, 2018, Appellant was interviewed with his counsel present by Detective Sergeant Mark Taylor and Officer Brian Bissett. Appellant had requested the interview. Appellant identified Pesta for the first time as his companion on the hill on April 26, 2018, and admitted that he recorded his presence in the area of Pleasant Heights controlled by rival gang members in order to post the videos on social media. Appellant admitted that he was brandishing the Luger in the videos. Appellant is depicted in the

videos wearing a purple bandana (the rival gang's color), and, in one of the videos, he announces that he is in their territory, and invites them to "come slide."

{¶13} During the interview, Appellant explained that the Luger was inoperable. He further explained that the reason that he and Pesta were on the hill on April 26, 2018 was to sell the Luger. When Pesta announced his intent to fire upon the residence where a man named "Dash" was known to stay, Appellant warranted that he turned back because he did not want to be involved in the crime. Dallas Fleshman was the boyfriend of the resident at 1203 Plum Street.

{¶14} After listening to Appellant's version of the events of April 26, 2018, Detective Taylor and Officer Bissett expressed disbelief that Appellant would enter rival gang territory with an inoperable handgun. They further questioned the veracity of Appellant's statement that he did not attempt to fire the Luger at either of the two crime scenes on April 26, 2018, based on a ballistics report from BCI, which established that three of the four unspent 9mm cartridges in evidence had been cycled through the Luger.

{¶15} At trial, the state offered the testimony of Michael E. Roberts, a firearms expert from Ohio BCI. Roberts testified that when he first examined the Luger, it was "out of battery," that is, a lever on the hand gun was out of position. Roberts explained that the firing pin does not get struck by the hammer when the lever in the gun is out of position. However, even if a semi-automatic weapon is out of battery, a cartridge will nonetheless cycle through the weapon and be extracted without firing. Roberts further explained that "you can pull the trigger all day long and it's not going to go off" when a firearm is out of battery. Roberts testified that, when he returned the lever to the correct position, the weapon fired as designed.

{¶16} Roberts conceded that the spent bullets found at the crime scenes were not discharged from the Luger. However, three of the four unspent rounds – one of the two found on Appellant's person; the one found at the crime scene on Plum Street; and the one found at the crime scene on State Street – were cycled through the Luger. The prosecutor asked, "And if that slide lever was not in the correct position and the gun was fired and it was ejected out, they all left the same – those all have the same markings as something that would have been fired from [the Luger]?" Roberts responded, "Yes, if it

was fired or it was cycled [through the Luger] they all have the same extractor marks." (*Id.* at 316-317.)

**{¶17}** With the foregoing evidence admitted at trial, Appellant took the stand in his own defense and provided the following testimony. Appellant was convicted of heroin trafficking and burglary on September 19, 2016 and sentenced to an agreed aggregate sentence of eighteen months. He was released from prison on March 20, 2018, and was on postrelease control, as well as under a lifetime weapons ban, when he committed the crimes that are the subject of this appeal.

**{¶18}** Appellant admitted his membership in two Steubenville street gangs. Although he was only affiliated with the gangs prior to his incarceration, he became a full-fledged member of the gangs after his release from prison.

**{¶19}** Appellant and his (now deceased) friend were on the south end of Steubenville and shooting fireworks at the residence of Appellant's next-door neighbor after midnight on April 26, 2018. At approximately 4:00 a.m., Pesta arrived in order to commit a burglary with Appellant. According to Appellant's testimony, the exchange on Facebook Messenger from the previous day referred to a burglary the two men had planned to commit on April 26, 2018. However, Appellant told Pesta on April 26, 2018 that he no longer wanted to commit the burglary.

**{¶20}** During their conversation, Appellant informed Pesta that he intended to sell the Luger to an acquaintance on Snapchat because the Luger no longer functioned. Appellant testified that he raised the idea of selling the Luger as an alternative money-making venture instead of the planned burglary.

**{¶21}** When Appellant's counsel asked him how he knew the Luger was inoperable, Appellant responded:

> I put a bullet in the clip, in the magazine, put it in there, cocked it back, it would chamber the bullet, tried to shoot it into the ground, it wouldn't shoot. I took the clip out, took the bullet out of the head, put it back in the clip, tried it again, tried five, six times, it would not shoot.

(*Id.* at 412.)

Case No. 19 JE 0004

{¶22} Appellant testified on cross-examination that he only successfully fired the gun one time, the day that he bought it. Appellant conceded that he was photographed brandishing guns in the past, but claimed that he was not aware of the manner in which guns operated.

{¶23} Pesta told Appellant that he knew a potential buyer who would pay a higher price than Appellant had negotiated with the buyer on Snapchat. Pesta told Appellant that the potential buyer had asked that the two men bring the gun to the "Maxwell side" of the hill. Although Appellant expressed hesitation about entering rival gang territory, Pesta said that they would not be in any danger because of the early morning hour.

{¶24} Appellant conceded that he was wearing a black jacket, a red Under Armour shirt, a purple bandana, a white t-shirt, blue jeans and white shoes. Appellant testified that the purple bandana was a joke, as purple is the color worn by the rival gang.

{¶25} Appellant and Pesta walked to Pleasant Heights in order to meet the potential buyer for the gun, and, along the way, took the videos entered into evidence with Appellant's cellular phone. Appellant planned to post the videos to social media when he returned home in order to taunt the rival gang members. Appellant conceded that he is depicted in the cellular telephone video carrying the Luger and that he was under a weapons disability at the time. He explained that he did not believe he was acting in contravention of the law because the Luger was inoperable and it was not loaded.

{¶26} Appellant testified that he gave all of his 9mm ammunition to Pesta prior to departing from the south end, because Appellant was selling the Luger and had no use for the cartridges. He explained that one cartridge fell to the ground, which he retrieved and attempted to hand to Pesta. However, Pesta was preoccupied with securing the rest of the ammunition in his pants' pocket, so Appellant put the single cartridge in his own pocket in order to give it to Pesta at some later time.

{¶27} As the men turned onto State Street from Maxwell Avenue, Pesta divulged his intent to "shoot up [the] crib" of a gang member named "Dash." (*Id.* at 424.) After refusing to participate and attempting to dissuade Pesta, Appellant turned and walked in the opposite direction back toward Maxwell Avenue to Adams Street.

{¶28} While on Adams Street, Appellant heard gunshots. Not long after, Pesta caught up with Appellant on Adams. Appellant testified that he fled when he was

confronted by Captain Buchmelter because he believed he had an outstanding warrant for domestic violence. Appellant further testified that the Luger must have fallen from his jacket pocket, because he did not intentionally discard it.

**{¶29}** Finally, Appellant explained that a friend took the photographs of Appellant in front of 1203 Plum Street because he knew that someone from the rival gang occasionally stayed there.  Appellant was aware of this fact because his brother dated the sister of the mother of Dash's child.

**{¶30}** Appellant was found guilty on all counts. Although the jury was instructed as to Appellant both as a principal and, in the alternative, as an aider and abettor on the discharging a firearm at or into a habitat charge, he was convicted as a principal.  The trial court sentenced Appellant to an aggregate term of imprisonment of thirteen years. This timely appeal followed.

**ASSIGNMENT OF ERROR**

**THE APPELLANT WAS NOT AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL:**

**BY FAILURE OF TRIAL COUNSEL TO CHALLENGE DETECTIVE HOLZWORTH'S IDENTIFICATION OF THE DEFENDANT.**

**BY FAILURE OF TRIAL COUNSEL TO OBJECT, MOVE TO STRIKE, AND SEEK A CORRECTIVE INSTRUCTION REGARDING DETECTIVE HOLZWORTH'S TESTIMONY THAT, WHILE IN CUSOTDY, THE APPELLANT DECLINED TO ANSWER QUESTIONS OF LAW ENFORCEMENT OFFICERS.**

**{¶31}** In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that his counsel's performance was deficient and that he was prejudiced by the deficiency. *State v. White*, 7th Dist. Jefferson No. 13 JE 33, 2014-Ohio-4153, ¶ 18, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 107. In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Lyons*, 7th Dist. Belmont No. 14 BE 28, 2015-Ohio-3325, ¶ 11, citing *Strickland* at 694. Appellant bears the burden of proof on the issue of counsel's ineffectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999).

**{¶32}** In Ohio, a licensed attorney is presumed competent. *Id.* Therefore, to fairly assess counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U .S. at 689, 104 S.Ct. at 2065.

**{¶33}** In the first part of Appellant's sole assignment of error, he challenges his trial counsel's failure to cross-examine Detective Regis Holzworth on his identification of Appellant from the pole camera on Maxwell Avenue. Appellant writes, "[c]ounsel did not inquire regarding the quality of the video; the distance between the camera and the Appellant; whether it was daylight or dark; the lighting conditions; whether the detective had previous encounters with the Appellant; or a description of the height, weight, and skin complexion of the person viewed [sic] the video." (Appellant's Brf., pp. 5-6.) The Maxwell Avenue pole camera video was admitted into evidence at trial.

**{¶34}** Detective Holzworth testified that an arrestee's clothing is collected and bagged when he or she arrives at the County jail. Detective Holzworth identified a pair of blue jeans, which were taken from Appellant by Detective Holzworth after Appellant's arrest as the same blue jeans worn by one of the men in the pole camera video:

> Q     When you watched [the pole camera video] did you notice anything about any individuals that may have been seen on that video?
>
> A     A subject we identified as [Appellant] is – is observed on the City camera walking on Maxwell Avenue wearing in this case those same pants.
>
> * * *

Case No. 19 JE 0004

Okay. And so you looked at the pants that you recovered from the jail and the male seen on the Maxwell video you determined that that's the same individual.

A       Yes.

(*Id.* at 234-235.) Detective Holzworth further testified that Appellant had a gun in his hand.

**{¶35}** Captain Buchmelter also identified Appellant as the man on the pole camera video and further stated that Appellant was carrying a gun. Captain Buchmelter testified that the two men in the pole camera footage were the same men that he pursued on Adams Avenue. However, Appellant does not challenge his trial counsel's failure to cross-examine Captain Buchmelter's identification of Appellant on the pole camera video.

**{¶36}** The pole camera video from Maxwell Avenue is grainy and Appellant is not clearly identifiable. However, we find that Appellant cannot demonstrate any deficient performance by trial counsel or resulting prejudice because Appellant admitted that he was present on Maxwell Avenue with the Luger prior to the 9-1-1 calls on April 26, 2018. When his counsel asked him when the cellular telephone videos were taken, Appellant conceded, "The first one was on Maxwell, Maxwell Avenue* * * walking toward the food market." He further conceded that the video was taken before the shooting. (*Id.* at 419.) In addition to Appellant's admissions at trial, Appellant's cellular telephone video place him on Maxwell Avenue according to the testimony of Officer Bissett, who identified landmarks in the background of the video to fix Appellant's location.

**{¶37}** Finally, Captain Buchmelter identified the individuals captured on the pole camera video as the men he first saw on Adams Avenue. Based on the evidence in the record establishing Appellant's presence on Maxwell Avenue prior to the crimes occurring on April 26, 2018, we find that trial counsel's failure to challenge Holzworth's identification did not constitute deficient performance, nor did it prejudice Appellant. Accordingly, we find that the first part of Appellant's sole assignment of error is not well-taken.

**{¶38}** In the second part of Appellant's sole assignment of error, he contends that his trial counsel provided ineffective assistance when she failed to object to and move to strike Detective Holzworth's testimony that Appellant refused to talk to Detective

Holzworth after Appellant's arrest. On cross-examination, defense counsel asked Detective Holzworth if he was responsible for any other part of Appellant's arrest in addition to photographing Appellant's clothing. Detective Holzworth responded, "I went down to the County jail, attempted to speak with [Appellant]. He declined to make a statement." Defendant counsel responded, "[Appellant] does not have to speak with you; correct?" Detective Holzworth responded, "That's correct." (*Id.* at 247-248.)

{¶39} In *State v. Reed*, 10th Dist. Franklin No. 08AP-20, 2008-Ohio-6082, the defendant argued that his trial counsel provided ineffective assistance because he elicited testimony from a police officer on cross-examination regarding the defendant's post-arrest silence. Similar to the above-captioned appeal, defense counsel in *Reed* asked the arresting officer to recount the events of Reed's arrest. The officer responded that he read Reed his rights, Reed signed a form documenting his refusal to answer questions, and, as a consequence, the officer did not ask Reed any questions. Reed's trial counsel asked the officer to read the *Miranda* warning, in order to demonstrate that Reed was merely exercising his constitutional right to remain silent. *Id.* at ¶ 17-18.

{¶40} Reed asserted that his trial counsel's inquiry violated his Fifth Amendment right against self-incrimination, as recognized in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). According to *Doyle*, due process prohibits a state prosecutor from impeaching a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Id.* at 611.

{¶41} However, where a defendant's post-arrest silence is elicited on cross-examination, Ohio courts have consistently found no *Doyle* violations. *State v. Stevenson* (July 21, 2000), 6th Dist. Erie No. E–94–002 (because appellant's trial counsel elicited two answers concerning the defendant's post-*Miranda* silence, the rule in *Doyle* was inapplicable); *State v. Vaughn* (July 11, 1985), 8th Dist. Cuyahoga No. 49272 (the issue of the defendant's post-arrest silence was raised first by the defendant's counsel on direct examination; therefore, the defendant waived any rights under *Doyle* and the prosecution was permitted to cross-examine the defendant on this issue); *State v. Lee* (Dec. 31, 1997), 11th Dist. Trumbull No. 95-T-5371 (*Doyle* inapplicable where appellant's attorney facilitated the presentation of the testimony referring to appellant's silence after being

given *Miranda* rights, and "admission of such testimony is not reversible error, since it was invited by the questioning of appellant's attorney"); *State v. Lamb*, 12th Dist. Butler No. CA 2002-07-171, 2003-Ohio-3870 (no Doyle violation of prosecutor's cross-examination of the defendant regarding the defendant's post-arrest, post-*Miranda* silence where the issue was first raised by the defendant).

**{¶42}** Recognizing that the facts in *Reed* did not establish that the prosecution commented at all, much less on its own initiative, on Reed's silence, the Tenth District concluded that the prohibitions defined by *Doyle* were not applicable. The *Reed* Court held instead that "the scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *Id.* at ¶ 23, citing *State v. Conway*, 109 Ohio St.3d 412, 848 N.E.2d 810, 2006-Ohio-2815, ¶ 101, citing *State v. Hoffner*, 102 Ohio St.3d 358, 811 N.E.2d 48, 2004-Ohio-3430; *State v. Campbell*, 90 Ohio St.3d 320, 339, 738 N.E.2d 1178 (2000). The Tenth District concluded that defense counsel was attempting to elicit testimony that bolstered Reed's recitation of the events of his arrest (he took the stand later in the trial), and that defense counsel trial strategy in attempting to bolster Reed's future testimony was not unreasonable.

**{¶43}** While the intent behind the general question at issue here is not ascertainable, the Ohio Supreme Court has noted that "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment." *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, citing *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006). As such, defense counsel's decision not to move to strike an answer can be a trial tactic to prevent emphasizing the information inadvertently elicited. *State v. Fuller*, 7th Dist. Belmont No. 14 BE 0016, 2016-Ohio-4796, ¶ 48, *State v. Schlagheck*, 6th Dist. Lucas No. L-00-1121, 2001 WL 85158, *6 (Feb. 2, 2001). Such trial tactic is presumed to be used by defense counsel as part of trial strategy. *Id.*

**{¶44}** Here, Detective Holzworth's testimony regarding Appellant's post-arrest silence was elicited on cross-examination. Defense counsel immediately asked Detective Holzworth to clarify that Appellant was not obligated to respond to questioning. The state did not refer to Appellant's refusal to be interviewed in its redirect of Detective Holzworth, its cross-examination of Appellant, nor its closing argument, but, instead, referred solely

to the evidence that Appellant's story of the events of April 26, 2018 changed over time as additional evidence implicated him in the crimes.

{¶45} Accordingly, we find that defense counsel's failure to object or move to strike Holzworth's answer could have been a tactic to avoid drawing additional attention to Appellant's post-arrest silence. We further find that, assuming that the defense counsel's performance was deficient, her failure to object or move to strike Detective Holzworth's answer did not affect the outcome of the trial based on additional compelling evidence in the record that supports Appellant's convictions. Therefore, we find that the second part of Appellant's sole assignment of error is meritless.

## CONCLUSION

{¶46} Because Appellant has failed to demonstrate that defense counsel's performance was deficient or that he suffered any prejudice as a result her challenged conduct, Appellants sole assignment of error is overruled and his convictions are affirmed.

Donofrio, J., concurs.

Waite, P.J., concurs.

[Cite as *State v. Whatley*, 2020-Ohio-763.]

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**