[Cite as *State v. Arnold*, 2023-Ohio-4762.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | Case No. CT2022-0090 |
| | : | |
| JAY ARNOLD | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Muskingum County
Court of Common Pleas, Case No.
CR2022-0350

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: December 27, 2023

APPEARANCES:

For Plaintiff-Appellee:

RONALD L. WELCH
MUSKINGUM CO. PROSECUTOR
TAYLOR P. BENNINGTON
27 North Fifth St., P.O. Box 189
Zanesville, OH 43702-0189

For Defendant-Appellant:

APRIL F. CAMPBELL
Campbell Law, LLC
545 Metro Place South, Ste. 100
Dublin, OH 43017

*Delaney, J.*

{¶1} Appellant Jay Arnold appeals from the November 23, 2022 Entry of the Muskingum County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

*Appellee's evidence*

{¶2} This case arose on August 18, 2016, when Arnold's Van World reported a stolen vehicle to the Zanesville Police Department. At that time, Jim Arnold owned Arnold's Van World but has since passed away. The stolen vehicle was a black 2-door 2001 Pontiac Grand Prix.  Ptl. Landerman took the report and noted the VIN of the Grand Prix, which had been parked on the south side of the lot where there were no security cameras.  No suspects were identified in the vehicle theft.

{¶3} Jim Arnold's wife Nancy made the report and didn't know how long the Grand Prix was missing. A few days earlier, the dealership reported thefts of catalytic converters and suspected a vehicle was also missing, but couldn't confirm the vehicle theft until an inventory on August 18.

{¶4} On September 3, 2016, Ptl. Brown of the Zanesville Police Department responded to Arnold's Van World for a report of additional information on the theft of catalytic converters. This time, Jim Arnold was present and showed Brown security footage of the back lot of the dealership. The video showed a dark car pull into the lot and back up to the building. A male in dark clothes got out of the car, walked out of camera view, came back, and left. Later, another person entered the camera view wearing a white construction helmet and reflective vest. Brown tentatively identified the

December 20, 2023

car as a black Pontiac. Jim Arnold did not identify the person on the video and Brown testified he was not told appellant--the son of Jim Arnold--was a suspect.

{¶5} On September 26, 2016, Ptl. Moore of the Zanesville Police Department responded to the Putnam Tavern regarding a complaint of a suspicious male in the parking lot looking under cars with a flashlight. The Putnam Tavern happened to be next to the "New to You" car lot. Moore arrived on the scene and observed a car parked southbound along the roadway, running, with its lights on. Moore parked his cruiser directly behind the vehicle, a "primer gray" Pontiac. No one was inside the Pontiac and Moore noticed the car had a very old dealer tag which he attempted to run through dispatch without success. Moore explained a dealer plate is a generic plate owned by dealership and not assigned to a particular vehicle.

{¶6} Moore observed a man walking toward the Pontiac from the area of the car lot, wearing a white hardhat and a reflective vest. The man walked around the Pontiac and got into the driver's seat. Moore exited his cruiser and the man started to drive away, so Moore activated the strobe on his flashlight to signal him to stop. Moore approached the vehicle and spoke to the man, who was alone in the car. Moore asked the man if he was looking under vehicles with a flashlight, and he said no. Moore asked for identification and the man provided the driver's license of appellant, Jay Arnold. Moore confirmed that the license matched the individual in the Pontiac, and identified appellant at trial as the man he spoke to on September 26, 2016.

{¶7} Another officer arrived on the scene and Moore walked around the back of the Pontiac to speak to him. At the same time, Moore ran appellant's license through dispatch and learned appellant had at least one valid arrest warrant from Muskingum

County. Moore walked back around to the driver's side of the vehicle and noticed appellant was now very nervous, fidgeting and lighting a cigarette. Moore asked him to shut the car off and appellant complied. Moore intended to arrest appellant and reached for the door handle to ask appellant to step out of the car.

{¶8} At that point, appellant started the Pontiac and took off, squealing the tires and causing the vehicle's back end to drift sideways, almost striking Moore. Moore ran to his cruiser, activated the lights and siren, and initiated a pursuit. Moore kept up with appellant for a few blocks, but appellant ran a red light and went left of center, passing cars on a double-yellow line. Moore lost visual contact with appellant because he had to stop for the red light.

{¶9} Moore returned to the New to You car lot to check the area and noticed a jack under one of the cars. Dispatch advised the Pontiac turned into an alley, crashed into a pole, and had a flat tire. Moore went to the crash scene and appellant was not located with the Pontiac. Moore ran the VIN and discovered it was reported stolen from Arnold's Auto Sales.[1] He collected the white hardhat from the front passenger seat of the vehicle and entered it into evidence, along with appellant's driver's license, which Moore was holding when appellant fled.

{¶10} The driver of the vehicle—appellant—was not located after the Pontiac was found, despite searches including K-9 tracking from the crash site.

---

[1] "Arnold's Auto Sales" was used interchangeably by witnesses with "Arnold's Van World" to refer to the dealership owned by appellant's father, Jim Arnold.

*Defense case*

{¶11} Melissa Arnold is appellant's sister and Jim Arnold's daughter. Melissa testified that in 2016, she worked at the car lot with her father and she in fact "ran the place." T. 169. When asked what was the role of Nancy Arnold, Jim's wife and Melissa's stepmother, Melissa said Nancy was "in and out, getting her nails done." Melissa testified that in July 2016, Jim Arnold "gave" appellant a 2001 Pontiac Grand Prix and a $50 bill to put gas in the car. Melissa testified she was present when Jim handed the keys to appellant, early in the morning before the dealership opened for business. Nancy was not present and may not have known that Jim gave appellant the car. Melissa testified she was so busy running the car lot she had no idea what her brother did with the car and couldn't provide any further information. Nancy reported the Pontiac stolen and Melissa didn't know how or why she did that.

{¶12} Upon cross examination, Melissa said Jim Arnold was the owner and operator of the car lot and frequently "gave" cars to family and friends to drive on dealer plates. She testified there "was no set time" for appellant to return the Pontiac. She doesn't know anything about how or why the Pontiac was reported stolen; Melissa agreed her father would remember if he "gave" appellant a car from the lot, and would have put a valid plate on the vehicle. However, she said, sometimes plates went missing and registration stickers fell off.

{¶13} The next defense witness was Teresa Arnold, appellant's mother. Teresa testified that in July 2016, she went to Florida to take care of her stepmother and asked appellant to come down and help her. Teresa testified appellant came to Florida in September. She presented a Florida driver's license for appellant which was issued on

February 19, 2016.  Teresa stayed in Florida for three years but couldn't remember where or when appellant was with her; she "thinks" he may have been working in Cape Canaveral or Cocoa Beach in 2018.

{¶14} Upon cross examination, Teresa said appellant traveled to Florida in early September 2016 but she wasn't sure of exact dates.  When asked how he got to Florida, whether he flew or drove, Teresa responded that "someone brought him down" but she didn't know who.  She was certain, however, that appellant was in Florida with her on September 26, 2016.

{¶15} Teresa acknowledged police came to her house in July 2022 looking for appellant and she said he was in Florida, denying he was in her house.  Teresa let police search her house and appellant was found in a crawl space under her kitchen floor.

{¶16} Upon redirect, Teresa insisted appellant came to Florida in early September 2016 and stayed until after Christmas 2016.

{¶17} The next defense witness was Jeanette Aber, a friend of Teresa, who testified she went to Florida with Teresa sometime around September 3, 2016, remained in Florida for 5 weeks, and saw appellant frequently during that time. Upon cross examination, Jeanette said she didn't recall where she was on September 26, 2016, or whether appellant was present.

*Appellee's rebuttal evidence*

{¶18} Appellee then called two rebuttal witnesses.

{¶19} Detective Don Bates is an evidence technician with the Zanesville Police Department. On September 27, 2016, he photographed the "New to You" car lot by Putnam's Tavern.  He then went to Harper's Auto Body to photograph the crashed Pontiac

and encountered Jim Arnold, who was also at Harper's looking at the car. Jim Arnold told Bates he believed his son took the Pontiac from his car lot. The Pontiac was black when it left the car lot; the crashed vehicle was "tricolor" with gray primer on the back, gold on the front, and black on the roof. Jim Arnold did not indicate he gave appellant permission to take the car.

{¶20} Detective Steve Welker of the Zanesville Police Department testified he was investigating a separate matter and contacted Teresa Arnold in July 2022 because he had reason to believe Jona Perry and appellant were in Teresa's house, in connection with a separate investigation. Police obtained a search warrant but Teresa gave them permission to search. Appellant and Perry were found in her house and Teresa claimed to have no idea how they got there.

*Indictment, trial, conviction, and sentence*

{¶21} Appellant was charged by indictment with one count of receiving stolen property (motor vehicle) pursuant to R.C. 2913.51(A), a felony of the fourth degree [Count I]; one count of tampering with evidence pursuant to R.C. 2921.12(A)(1), a felony of the third degree [Count II]; one count of failure to comply (fleeing after felony) pursuant to R.C. 2921.331(B), a felony of the fourth degree [Count III]; and one count of failure to comply (risk of harm) pursuant to R.C. 2921.331(B), a felony of the third degree [Count IV].

{¶22} Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Counts I and II were dismissed prior to trial and the Counts were renumbered. Appellant moved for a judgment of acquittal pursuant to Crim.R. 29(A) at the close of appellee's evidence and the motion was overruled. Appellant was thereupon found guilty

as charged upon the original Counts III and IV, both failure to comply. The trial court found the counts merge for purposes of sentencing and appellee elected to sentence upon [Count IV]. The trial court imposed a prison term of 36 months.

{¶23} Appellant now appeals from the judgment entry of his conviction and sentence.

{¶24} Appellant raises three assignments of error:

**ASSIGNMENTS OF ERROR**

{¶25} "I. THE STATE'S EVIDENCE THAT ARNOLD COMMITTED THIRD AND FOURTH DEGREE FELONY FAILURE TO COMPLY WAS LEGALLY INSUFFICIENT FOR TWO REASONS: [1] THE STATE DID NOT PROVE ARNOLD FLED 'AFTER RECEIVING A VISIBLE OR AUDIBLE SIGNAL FOR HIM TO STOP.' [2] THE STATE DID NOT PROVE ARNOLD FLED 'IMMEDIATELY AFTER THE COMMISSION OF A FELONY' FOR FOURTH-DEGREE FELONY FAILURE TO COMPLY."

{¶26} "II. BECAUSE THE EVIDENCE WEIGHED MANIFESTLY AGAINST CONVICTING ARNOLD, THIS COURT SHOULD REVERSE HIS CONVICTIONS."

{¶27} "III. ARNOLD'S CONVICTIONS SHOULD BE REVERSED BECAUSE HIS TRIAL COUNSEL WAS INEFFECTIVE IN A MANNER THAT PREJUDICED ARNOLD."

**ANALYSIS**

I., II.

{¶28} Appellant's first two assignments of error are related and will be considered together. Appellant argues his convictions for two counts of failure to comply are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶29} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶30} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶31} Appellant was found guilty upon two counts of failure to comply pursuant to R.C. 2921.331(B); the amended Count I is a felony of the fourth degree pursuant to R.C.

2921.331(B) and (C)(4), and the second count is a felony of the third degree pursuant to R.C. 2921.331(B) and (E)(a)(ii). Those sections state:

> (B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

> (C)(1) Whoever violates this section is guilty of failure to comply with an order or signal of a police officer.

> * * * *.

> (4) Except as provided in division (C)(5) of this section, a violation of division (B) of this section is a felony of the fourth degree if the jury or judge as trier of fact finds by proof beyond a reasonable doubt that, in committing the offense, the offender was fleeing immediately after the commission of a felony.

> (5)(a) A violation of division (B) of this section is a felony of the third degree if the jury or judge as trier of fact finds any of the following by proof beyond a reasonable doubt:

> * * * *.

> (ii) The operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property.

> * * * *.

{¶32} Relevant to both counts, appellant argues there is no evidence appellant "receiv[ed] a visible or audible signal from a police office to bring [his] motor vehicle to a stop" and that the officer's flashlight is not an adequate signal. Ptl. Moore testified that

during his first contact with appellant on September 26, 2016, appellant got in the Pontiac and began to drive away when Moore pulled out his flashlight, put it in strobe mode, and shone it into appellant's rear window to signal him to stop. T. 127. Appellant did in fact stop, and Moore engaged with him to identify him, obtain his driver's license, and ask whether he was looking under cars with a flashlight. When dispatch alerted Moore that appellant had an active arrest warrant, Moore walked back toward appellant, told him to turn off the car, and noticed appellant appeared nervous. Appellant initially complied, but as Moore reached for the door handle to ask appellant to step out of the car, appellant "hurried up, started it, and took off." T. 131. Moore returned to his cruiser, activated lights and sirens, and initiated pursuit of appellant. T. 132.

{¶33} Appellant was therefore signaled to stop with visible lights and an audible siren, but eluded police during a pursuit and later crashed the vehicle. Appellant's contention that there is no evidence Moore signaled appellant to stop is belied by the record, supra, and we overrule this portion of his argument.

{¶34} Appellant next argues that there is no evidence appellant fled "immediately after the commission of a felony" for purposes of the renumbered Count I, a felony of the fourth degree. The felony at issue is receiving stolen property (motor vehicle), the original Count I. Appellee's argument at trial was appellant fled because he was found in the Pontiac which was reported stolen. Appellant argues that if he stole the Pontiac, he did so several weeks earlier and not immediately before he fled. Appellant was not facing a theft charge, however; instead, on September 26, 2016, he " * * *retain[ed] * * * property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." R.C. 2913.51(A).

{¶35} When Moore made contact, appellant was in possession of a stolen car. Appellee presented sufficient evidence appellant fled immediately after commission of a felony and we overrule this portion of appellant's argument.

{¶36} In his second assignment of error, appellant argues his convictions are against the manifest weight of the evidence. Upon a challenge to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Ashcraft*, 5th Dist. Richland No. 2021-CA-0024, 2023-Ohio-2378, ¶ 14, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997). In the instant case, we find no such manifest miscarriage of justice.

{¶37} "Weight of the evidence" addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541 (1997), *State v. Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 83. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶ 25, citing *Thompkins.* The uncontroverted evidence in the instant case established appellant fled after questioning by Moore, as Moore was about to apprehend him, leading police on a pursuit.

{¶38} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that " 'the jury clearly lost

its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). The Ohio Supreme Court has emphasized: " '[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.' " *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E.2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978).

{¶39} We find that this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the entire record in this matter we find appellant's convictions for failure to comply are not against the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt.

{¶40} The first and second assignments of error are overruled.

III.

{¶41} In his third assignment of error, appellant argues he received ineffective assistance of defense trial counsel because counsel failed to renew the Crim.R. 29(A) motion for acquittal at the close of all of the evidence. We disagree.

{¶42} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See, Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶43} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶44} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶45} Defense trial counsel made a Crim.R. 29 motion for acquittal at the close of appellee's case in chief and the motion was denied. At the conclusion of all the testimony, trial counsel did not renew the Crim.R. 29 motion.

{¶46} Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.

*State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. We have already determined that appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. Thus, we conclude defense trial counsel was not ineffective for failing to renew the motion for acquittal at the close of all the evidence because, had the motion been made, it would have been overruled by the trial court because the evidence presented by the state was more than sufficient to sustain appellant's convictions.

{¶47} The third assignment of error is overruled.

## CONCLUSION

{¶48} Appellant's three assignments of error are overruled and the judgment of the Muskingum County Court of Common Pleas is affirmed.

By: Delaney, P. J.,

Baldwin, J. and

King, J., concur.